Eugene I. SCHUPAK, M.D., d/b/a
Queens Artificial Kidney
Center, Plaintiff,

v.

Joseph A. CALIFANO, Jr., as Secretary
of Health, Education and
Welfare, Defendant.

No. 78 C 231.

United States District Court,
E. D. New York.

April 11, 1978.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for plaintiff; Leonard H. Rubin, New York City, of counsel.

David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y., for defendant; Jan F. Constantine, Asst. U. S.

Atty., Brooklyn, N. Y., James C. Pyles, Dept. of HEW, Baltimore, Md., of counsel.

## Memorandum of Decision and Order

MISHLER, Chief Judge.

Plaintiff is the sole proprietor of Queens Artificial Kidney Center ("Queens"), a medical facility which provides maintenance dialysis to outpatients who suffer from chronic renal disease. This service is reimbursable under Part B of the Health Insurance for the Aged Act, commonly known as the Medicare program. 42 U.S.C. §§ 1395 *et seq.* Plaintiff seeks a preliminary injunction enjoining the Secretary of Health, Education and Welfare (the "Secretary") from (i) considering cost information in determining plaintiff's rate of reimbursement; (ii) requiring the submission of data relating to plaintiff's costs of supplying renal dialysis services and (iii) suspending plaintiff's reimbursement for its failure to submit requested cost information. The Secretary moves for an order dismissing the complaint on the grounds that this court lacks subject matter jurisdiction and that the action is barred by *res judicata.* Fed.R. Civ.P. 12(b)(1), (6). In the alternative, the Secretary seeks an order pursuant to 28 U.S.C. § 1404(a) transferring the action to the United States District Court for the District of Columbia, the forum of previous litigation between the parties herein.

## THE MEDICARE PROGRAM AND ADOPTION OF THE END–STAGE RENAL DISEASE ("ESRD") PROGRAM

As enacted, the Medicare program has two parts, the hospital insurance, or Part A program, and the supplementary medical insurance, or Part B program.

Every individual who has attained age 65 and who satisfies the other conditions enumerated in 42 U.S.C. § 426 is entitled to hospital insurance benefits under Part A. Benefits include coverage for inpatient hospital services, post-hospital extended care services, and post-hospital home health services. 42 U.S.C. § 1395d. Part A is financed by social security taxes which are appropriated to, and administered by, a trust fund entitled Federal Hospital Insurance Trust Fund. 42 U.S.C. § 1395i.

The Part B scheme is a voluntary insurance program that is offered to those individuals who qualify for benefits under Part A. The benefits afforded those who elect to enroll in Part B are generally unrelated to inpatient hospital treatment; coverage is furnished for physicians' services, durable medical equipment, outpatient hospital services, laboratory services, and home health care for homebound patients. 42 U.S.C. § 1395k. Maintenance dialysis services supplied on an outpatient basis by free-standing facilities such as Queens are covered under this program. The funding of Part B is derived from premium payments made by its enrollees and contributions from the federal government; these sources comprise the Federal Supplementary Medical Trust Fund from which providers of services like Queens are reimbursed. 42 U.S.C. § 1395t.

Payment to those who treat or otherwise provide services to Part B beneficiaries is made at the rate of "80% of the reasonable charges for the services."[1] 42 U.S.C. § 1395*l*(a)(1). No specific definition of "reasonable charge" is set forth in the Medicare statutes; the sole guidance provided by Congress are those factors delineated in section 1395u. This section authorizes the Secretary to enter into contracts with private insurance carriers under which the latter, *inter alia,* determine whether a charge for a particular service is reasonable and actually disburse the funds to the provider of services. In establishing the reasonable charge for services, the insurance carrier shall take into consideration the " . . . customary charges for similar services generally made by the physician or other person furnishing such services, as

---

1. The individual beneficiary is responsible for the remaining twenty percent plus an annual deductible amount. 42 U.S.C. § 1395*l*(a),(b).

well as the prevailing charges in the locality for similar services." 42 U.S.C. § 1395u(b)(3). The Secretary has promulgated regulations defining customary charge (20 C.F.R. § 405.503) and prevailing charge (20 C.F.R. § 405.504).[2]

### The ESRD Program

Prior to the 1972 amendments to the Social Security Act, the cost of medical services furnished those afflicted with end-stage renal disease was reimbursable under the Medicare program only if that individual was 65 and otherwise eligible for Medicare benefits. On October 30, 1972, amendments to the Social Security Act were enacted; among the included provisions was the ESRD program, now codified at 42 U.S.C. §§ 426(e)–(g), which provides that any individual who has not attained age 65 but is fully or currently insured as statutorily defined and who is medically determined to have chronic renal disease requiring hemodialysis or renal transplantation is "deemed to be disabled for purposes of coverage under Parts A and B of Medicare . . . ." "Thus, for the first time a federal program was given responsibility for financing the care and treatment of virtually all persons with a particular diagnosis, i. e., end-stage renal disease, and for the reimbursement of virtually all costs of two particular types of treatment, renal dialysis and kidney transplantation." (Defendant's Memorandum in Support of Motion to Dismiss at 10). The amendment authorized the Secretary to " . . . limit reimbursement under Medicare for kidney transplant and dialysis to kidney disease centers which meet such requirements as he may by regulation prescribe." 42 U.S.C. § 426(g). Beyond the above statutes, no other legislative guidance was provided the Secretary with respect to the implementation of the ESRD program.

The ESRD program was signed into law on October 30, 1972, and to take effect on July 1, 1973, just eight months after its passage. Prior to the amendment, it was estimated that less than 500 medicare beneficiaries were receiving maintenance dialysis; under the amendment, it was estimated that the number of potential beneficiaries would skyrocket to 12,000. Thus, with a bare eight months to implement and administer a program of vast magnitude, the Social Security Administration began to gather information for the purpose of, *inter alia,* formulating criteria to be used in determining "reasonable charges" for services rendered by free-standing dialysis centers such as Queens. It was soon learned that the standards formerly employed under the Part B program to measure the reasonableness of charges were no longer viable. Reliable data relating to charges and costs of dialysis services were scarce, and the evidence that was available disclosed wide variations in the amounts paid for such services and in the amounts charged to state medicaid programs and private insurance carriers. Moreover, a non-Medicare competitive market as a criteria for measuring reasonable charge—akin to the prevailing rate standard outlined in 42 U.S.C. § 1395u(b)(3) and 20 C.F.R. § 405.504— would not be applicable after the effective date of the ESRD program since the renal dialysis market would be substantially preempted by Medicare. In order to begin operations by July 1, 1973, the Secretary promulgated interim regulations,[3] including 20 C.F.R. § 405.502(e), which established the criteria for determining reasonable charges. This rule provided in pertinent part:

> With respect to reimbursement for services in connection with renal dialysis and kidney transplantation, . . . reasonable charges may be defined in terms related to charges or costs prior to July 1, 1973, the costs and profits that are reasonable when the treatments are provided in an effective and economical manner, and/or charges made for other serv-

---

**2.** Under 42 U.S.C. § 1395hh, the Secretary is authorized to prescribe such regulations as may be necessary to carry out the administration of Part A and Part B Medicare insurance programs.

**3.** These regulations were issued on June 29, 1973, to take effect two days later.

ices, taking into account comparable physicians' time and skill requirements.

The specific formula implementing the above criteria—pending the receipt and analysis of reliable cost or charge data—was described in Intermediary Letter 73-25/73–22 ("I.L.–25"). I.L. 25 instructed the insurance carriers that the rate of reimbursement to free-standing dialysis facilities like Queens was to be derived from the weighted average of reimbursements received by that facility during the preceding twelve month period. This amount was denominated "estimated customary charge." If a facility deemed its estimated customary charge to be inadequate, it could submit cost data to the carrier or the Medicare bureau and request an equity adjustment.[4] Plaintiff's estimated customary charge (and thus rate of reimbursement) was computed at $99.09 per dialysis treatment; in April, 1975, the rate was increased to $107.46, retroactive to July 1, 1973.[5]

Since the inception of the ESRD program in July, 1973, the Medicare bureau, through its insurance carriers, has made repeated requests for cost information so that long-term reimbursement policy and regulations can be devised. Six intermediary letters, beginning with I.L. 73–53, issued in December, 1973, and ending with I.L. 78–9, issued in March, 1978, have been sent to plaintiff and other free-standing renal dialysis facilities requesting cost information. The last of these letters—I.L. 78–9—states that if completed cost questionnaires are not received by April 30, 1978, the carrier " . . . must suspend all medical payments for bills received after April 30, 1978, regardless of when the services were provided."[6] Plaintiff, along with the majority of free-standing dialysis facilities, has refused to submit the information.

On December 30, 1977, the Secretary published a second series of interim regulations, to take effect immediately, which specify the criteria for the determination of reasonable charges under the ESRD program. It is the legal validity of these regulations which plaintiff challenges. The new section 405.502(e) retains the same general criteria that were expressed in the first interim regulation: reasonable charges shall be defined " . . . in terms related to charges or costs prior to July 1, 1973, and to costs and allowances that are reasonable when the treatments are provided in an effective and economical manner."[7] The estimated customary charge formula and hardship exception set forth in I.L. 25 is incorporated in § 405.541(a), (b) and (e). Section (b) of 405.541 provides that the reimbursable amount to a renal dialysis facility for one dialysis treatment shall be the lower of the estimated customary charge and an administratively determined screen, i. e., an amount derived from available data that is used to identify costs or charges

4. I.L. 25 provided in pertinent part:

For the period beginning July 1, the estimated customary charge will be derived from the reimbursement from all parties made to the dialysis center for the services rendered to the patients during the prior 12 months. It is quite possible that several levels of payment were made depending on the allowable limits under the third-party payors program, i. e., State kidney disease programs, Blue Shield and other health insurance plans, Medicare, etc. The weighted average of all such reimbursements should be used to calculate the estimated customary charge. In addition, the rules for applying prevailing charge and comparability limitations should be implemented. No increase in these customary charges will normally be allowed until further instructions are issued. However, if a dialysis center can demonstrate unusual hardship flowing from application of the customary charge rule, the center may submit documentation and special arrangements may be made for an equity adjustment, as long as payment does not exceed the prevailing charge and does not violate the Economic Stabilization Program rules.

5. Prior to the ESRD program, plaintiff was reimbursed at the rate of $150 for every dialysis treatment given to individuals covered by Medicare.

6. The letter goes on to state that if the facility submits a completed questionnaire after payments have been suspended, the withheld payments should promptly be made to the facility.

7. The last clause of first interim regulation 405.502(e) is omitted in the new 405.502(e), that " . . . charges made for other services, taking into account comparable physicians' time and skill requirements," shall be a factor in defining reasonable charge.

which appear atypically high. Finally, 405.-541(f) requires dialysis facilities to submit cost data "beginning with the facility's first accounting year that ended after June 30, 1973" in order for the facility to secure reimbursement.[8]

Plaintiff alleges that the December 30th regulations are illegal because (i) the reimbursement formula (estimated customary charge) is not based upon those reasonable charge factors listed in 42 U.S.C. § 1395u (and as further defined in 20 C.F.R. §§ 405.503–.504) and thus the Secretary exceeded his statutory authority in enacting this formula; (ii) they are arbitrary, capricious, and constitute an abuse of the Secretary's discretion in violation of 5 U.S.C. § 706(2) and (iii) they violate plaintiff's constitutional right to due process.[9] Plaintiff also contends that the cost reporting requirements imposed by 42 C.F.R. § 405.-541(f) and by the intermediary letters are illegal because (i) intermediary letters 77–3 and 78–9 were not promulgated pursuant to the rulemaking provisions of the Administrative Procedure Act, 5 U.S.C. § 553; (ii) there is no statutory authority permitting the Secretary to consider the factor of cost in determining whether a charge is reasonable, and (iii) the submission of cost data violates plaintiff's constitutional rights.[10] Plaintiff's final charge is that defendant's failure to publish the December 30th regulations thirty days before their effective date contravenes section 553(d) of the Administrative Procedure Act. Plaintiff seeks a judgment declaring I.L. 78–9 and the December 30th regulations null and void.

## PRIOR PROCEEDINGS IN THE DISTRICT OF COLUMBIA

On July 11, 1975, plaintiff instituted an action against the Secretary of H.E.W. in the United States District Court for the District of Columbia. He sought a declaratory judgment stating that first interim regulation 405.502(e) and the reimbursement formula (estimated customary charge) established by I.L. 25 (see p. 110, supra) were illegal in that (i) they did not incorporate the criteria defining reasonable charge provided in 42 U.S.C. § 1395l and the regulations promulgated thereunder, and hence the Secretary had no statutory authority to enact them; (ii) the formula was arbitrary and an abuse of the Secretary's discretion in violation of 5 U.S.C. § 706(2); (iii) they violated plaintiff's constitutional rights, and (iv) I.L. 25 effected substantive changes in the rate of reimbursement made to dialysis facilities and hence was void for failure to comply with the notice and publication requirements of proposed rulemaking recited in 5 U.S.C. § 553.

On September 17, 1976, Chief Judge William B. Bryant granted partial summary judgment for both plaintiff and defendant. He found that the reimbursement formula contained in I.L. 25 was void and of no effect because it had been issued outside the rulemaking requirements of the Administrative Procedure Act. However, to avoid disruption of services to beneficiaries under the ESRD program, Judge Bryant stayed this portion of his order to enable the Secretary to promulgate a final regulation to replace I.L. 25.

The court went on to uphold the substantive validity of the reimbursement formula and the authority of the Secretary to relate reasonable charges to costs. It found that the Secretary's discretion under the Medicare Act to establish criteria for the deter-

---

**8.** More specifically, 405.541(f) provides that the cost information is required in accordance with 42 U.S.C. § 1395l (e). This latter section states: No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider . . . .

**9.** Plaintiff claims that the regulations deny him "a reasonable return on equity, and thus deprive [him] of property without due process of law, in violation of the Fifth Amendment. . . ." (Complaint, para. 24).

**10.** Plaintiff claims, inter alia, that by purporting to require the submission of cost data dating back to 1973, defendant is engaged in retroactive rulemaking in violation of the Fifth Amendment.

mination of reasonable charges is a broad one; that the criteria formerly adopted to measure reasonableness are ill-suited to the ESRD program; and that the standards and reimbursement formula established by the Secretary for the ESRD program fall well within the scope of the Medicare Act and the regulations promulgated thereunder. Judge Bryant also observed that the relation of reasonable charges to the cost of the services was fully consonant with congressional intention:

> . . . Congress did not intend that such facilities would be able in the absence of a meaningful market comparison, to specify arbitrarily what the program must reimburse them simply by denominating it a "charge," independent of any criteria defining reasonableness . . . . It is clear, rather, that Congress would expect that the Secretary would, after appropriate consideration, formulate reimbursement criteria for the determination of what such facilities could reasonably charge the program for such services. Given the universal recognition that, generally speaking, costs are one determinant of prices charged for a particular service or product, it cannot be said that Congress intended to prohibit the Secretary from taking note of that relationship in formulating those criteria. *Schupak v. Mathews*, No. 75–1109 (D.D.C. Sept. 17, 1976) at 10.

Plaintiff appealed the decision of the district court and on November 2, 1977, the Court of Appeals for the District of Columbia affirmed the lower court's "judgment" [11] but modified the stay order by limiting it to 60 days from the date of affirmance (November 2, 1977).

On January 18, 1977, the case was voluntarily dismissed without prejudice upon consent of both parties.

**11.** Notwithstanding the fact that Judge Bryant's decision was never reduced to judgment, the Court of Appeals, in its affirmance, referred to the district court order as a judgment, stating that " . . . the judgment of the District Court appealed from in this cause [sic] is hereby affirmed."

**12.** Since matters outside the pleading have been submitted by both parties and considered

## DISCUSSION

In addition to opposing plaintiff's motion for injunctive relief, the Secretary moves to dismiss the complaint on the grounds that this court lacks subject matter jurisdiction and that the action in the District of Columbia Circuit precludes the instant suit under the principle of *res judicata*. Although we find that the complaint fails to state a claim upon which relief may be granted, and hence must be dismissed, we do not base our decision on either ground raised by defendant.[12]

*Jurisdiction*

Relying chiefly on *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) and *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), defendant urges that the Social Security Act provides the sole basis for jurisdiction over claims arising thereunder, and that the provision of that Act governing the finality of the Secretary's decisions—section 205(h)—bars judicial review of the claims presented in the complaint before us. The third sentence of section 205(h), 42 U.S.C. § 405(h), provides in relevant part:

> No action against the United States, the Secretary, or any officer or employee thereof shall be brought under [§ 1331 *et seq.*] of Title 28 to recover on any claim arising under [Title II of the Social Security Act].

 Contrary to defendant's argument, this section is limited in scope to the assertion of claims for recovery of social security benefits; it does not embrace constitutional challenges or other charges of illegality, such as agency rulemaking in ex-

by the court, plaintiff's motion to dismiss is treated as a motion for summary judgment. Fed.R.Civ.P. 12(b)(6); *Gordon v. N. Y. Stock Exchange, Inc.*, 498 F.2d 1303, 1305 n.6 (2d Cir. 1974), *aff'd*, 422 U.S. 654, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Freeman v. Marine Midland Bank—New York*, 494 F.2d 1334, 1338 (2d Cir. 1974).

cess of statutory authority. Thus, in both *Salfi* and *Sanders*, plaintiffs sought review of denials of benefits by the Social Security Administration; the fact that the *Salfi* claimant also sought a declaratory judgment stating that the statute upon which the Administration bottomed its denial of benefits was unconstitutional did not alter the basic nature of her claim, i. e., one to recover insurance benefits. Since the action before us does not seek judicial review of a denial of benefits, " . . . nonstatutory judicial review continues to be available under [the Federal Question Statute], 28 U.S.C. § 1331 and section 10 of the Administrative Procedure Act, 5 U.S.C. § 704. *Schupak v. Mathews, supra* at 4–5.[13]

### Res Judicata and Law of the Case

Defendant argues that plaintiff's cause of action in the case at bar and the issues upon which it is founded " .. . . have been presented, considered and decided by the district and circuit courts for the District of Columbia," that "Chief Judge William B. Bryant granted summary judgment in favor of the Secretary on the merits thereby upholding the substantive validity of the reimbursement formula and the Secretary's authority to relate reasonable charges to cost," and thus the doctrine of *res judicata* operates as a bar to the instant suit. (Defendant's Memorandum in Support of Motion to Dismiss at 30, 35).

■■ Multiple readings of the D. C. Circuit decisions, taking judicial notice of those proceedings, and a hearing devoted solely to the issue of *res judicata*[14] convince us that these cases cannot be reduced to the simple formula described above. Rather, the haunting presence of three ·unsettled issues—each by itself a barrier to the application of *res judicata*—compels our rejection of this defense. The unresolved questions relate to the finality of the district court order or judgment, the scope of that order or judgment, and the subsequent stipulation of dismissal entered into by the parties. Regarding the first issue, we only note that the docket sheet fails to indicate, and Judge Bryant's decision fails to direct, the entry of a judgment. The status and breadth of the lower court decision becomes even murkier with respect to the Secretary's motion for summary judgment; presumably, the finding that I.L. 25 was void for failure to comply with the rulemaking provisions of the Administrative Procedure Act rendered the court's discussion of the "substantive" validity of the Secretary's actions dictum. Finally, notwithstanding the Secretary's insistence that the government never intended to stipulate to a voluntary dismissal without prejudice of the entire case,[15] the fact is that a dismissal of this scope remains on the record. "The effect of a voluntary dismissal without prejudice is to render the proceedings a nullity and leave the parties as if the action had never been brought. It carries down with it previous proceedings and orders in the action. . . ." Neither *res judicata* nor collateral estoppel is traditionally applicable to such a dismissal. *In re Piper Aircraft Dist. Sys. Antitrust Lit.*, 551 F.2d 213, 219 (8th Cir. 1977); *Hill v. W. Bruns & Co.*, 498 F.2d 565, 567 n.2 (2d

---

**13.** The court notes the inconsistent posture of defendant in asserting this argument, since the very case which defendant claims to have *res judicata* effect, *Schupak v. Mathews, supra*, rejected this contention and found subject matter jurisdiction.

**14.** On April 1, 1977, this court conducted a hearing in an attempt to clarify the issues raised by the *res judicata* defense. Counsel for both sides appeared and presented their arguments.

**15.** The Secretary's position concerning the stipulation of dismissal is expressed in a letter dated March 31, 1978, sent to the court by James C. Pyles, a member of the Office of the

General Counsel, Department of Health, Education and Welfare:

[P]laintiff's attorneys never represented in any way that they intended to seek to vacate the decisions of the district and circuit courts in the District of Columbia case nor did the government ever intend to stipulate to such a dismissal. Plaintiff's attorneys represented that their position at the conference would be that the stay should be lifted merely in order to conclude the litigation. In our opinion, that is the only part of the district court's order to which the dismissal could have applied.

Cir. 1974); *see A. B. Dick Co. v. Marr*, 197 F.2d 498, 502 (2d Cir. 1952).

■ While *res judicata* bars all subsequent litigation between the parties on the same cause of action when a final, valid judgment has been rendered on the merits, the principle known as law of the case, although not as sweeping as *res judicata*, bars reconsideration of rules of law enunciated by trial and appellate courts in previous litigation between the parties.[16] It is a cousin to the doctrine of stare decisis—let that which has been decided stand—and expresses the practice of the courts to refuse to reopen that which has been decided. The principle is not inexorable or absolute, but is founded on the policy of judicial economy. It is aimed at getting a case litigated, i. e., terminated by a final judgment. "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden Company-Dunkee Famous Foods Div.*, 327 F.2d 944, 953 (2d Cir.), *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964); *see also United States v. Fernandez*, 506 F.2d 1200 (2d Cir. 1974); *Antonioli v. Lehigh Coal & Navigation Co.*, 451 F.2d 1171, 1178 (3d Cir. 1971); 1B Moore's Federal Practice, *supra* at ¶ 404.

■ The authority of the Secretary to utilize cost as a factor in determining reasonable charge and the legality of the ESRD reimbursement formula, having been established by an appellate court, constitute the law of the case and bar the parties from relitigating those identical issues in the instant proceeding. While rulings that become the law of the case do not rigidly bind a court with all the finality of *res judicata*, the discretion of a court to review earlier decisions " . . . is one which should be exercised sparingly, so as not to undermine the salutary policy or finality of adjudication that is the basis of the law of the case rule." *United States v. Fernandez, supra* at 1204. Having found Judge Bryant's decision to be a sound and well-reasoned one, we refuse to depart from the legal pronouncements made therein.[17]

*Failure to State a Claim*

■ Assuming *arguendo* that law of the case were not applied, we find that the complaint fails to state a claim as a matter of law. For the reasons set forth in Judge Bryant's opinion, and our own, detailed below, we conclude that the rate of reimbursement for ESRD services and the authority of the Secretary to relate reasonable charge to cost are in full conformity with the mandates of the Social Security Act and the expectations of Congress when it enacted the ESRD program.

■ We fully concur with Judge Bryant's conclusion that the Social Security Act delegates broad authority to the Secretary in defining reasonable charge for services provided under Part B of the Medicare program. Judge Bryant's analysis need not be repeated. We only add that plaintiff's

---

**16.** The rule has been stated as follows:

> When . . . a federal court enunciates a rule of law to be applied in the case at bar it not only establishes a precedent for subsequent cases under the doctrine of stare decisis, but, as a general proposition, it establishes the law, which other courts owing obedience to it *must*, and which it itself will, normally apply to the same issues in subsequent proceedings in that case. 1B Moore's Federal Practice ¶ 0.404[1] at 402–3 (2d ed. 1974).

**17.** We realize that our application of the law of the case deviates from customary practice in two respects. First, the doctrine is generally employed to bar relitigation of issues decided in earlier proceedings of the *same* lawsuit. *But see Antonioli v. Lehigh Coal & Navigation Co.*,

*supra* (law of the case applied to subsequent lawsuit between the same parties); *Galpin v. Page*, 18 Wall. 350, 365, 21 L.Ed. 959 (1874) and *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284 (1940) (legal adjudications in state actions applied to subsequent federal court actions between the same parties or their privies). Second, law of the case technically binds only those courts which owe obedience to the court which established the legal ruling. While the decision of the D. C. Circuit does not bind us, it is persuasive authority and thus we elect to follow it absent a decision on the question by the Second Circuit. *See Lang v. Elm City Constr. Co.*, 217 F.Supp. 873, 877 (D.Conn.), *aff'd*, 324 F.2d 235 (2d Cir. 1963).

claims—both here and in the D.C. Circuit—are premised upon a rigid reading of 42 U.S.C. § 1395u that is wholly inconsistent with the Medicare provisions of the Social Security Act and their legislative history. Certainly, the fact that § 1395u delineates two factors in defining reasonable charge (customary and prevailing charge) cannot be construed as prohibiting the Secretary from prescribing additional criteria, e. g. costs, when those factors do not produce valid results.

■ Under 42 U.S.C. § 1395hh, the Secretary is authorized to promulgate such regulations as may be necessary to carry out the administration of the Medicare program; as provided in § 1395u, this administration entails the management of benefits " . . . with maximum efficiency and convenience for individuals entitled to benefits . . . and for providers of services and other persons furnishing services to such individuals . . . ." Thus, in administering the Part B program, the Secretary must define reasonable charges in such a manner as to encourage the provision of services to Part B beneficiaries and, at the same time, in a way that will not squander the assets of the Federal Supplementary Medical Trust Fund, nor unnecessarily burden the beneficiaries, who remain responsible for twenty percent of the charges. The Secretary's resort to cost as one factor to be taken into account in determining reasonable charges for ESRD services is clearly consistent with the Secretary's fiscal responsibility to the 25 million beneficiaries whose voluntary contributions provide nearly one-half of the Part B Trust Fund. At the same time, by basing reimbursement upon the average payments received during the year preceding the enactment of the ESRD program, the Secretary is also protecting the interests of those providers of services to ESRD beneficiaries.

The utilization of cost as a criteria in defining reasonable charge is also supported by the legislative history of the ESRD amendment. Prior to its final vote in the Senate, Senator Russell B. Long, one of the bill's co-sponsors, addressed Congress, stating:

> With respect to the coverage of kidney dialysis and transplantation, *the Secretary would have the authority to define reasonable charges in terms related to the reasonable costs of the treatment provided* and comparable charges for physician's time and skills, since obtaining customary and prevailing charges for new and complex procedures—many of which will be reimbursed in all instances by the program—would be quite difficult administratively. (emphasis added). 118 Cong. Rec. 36805 (1972).

■ Finally, the inclusion of reimbursements from the New York State Medicaid Program to compute plaintiff's estimated customary charge does not violate the Constitution or 20 C.F.R. § 405.503(a). *Mathews v. Schupak, supra* at 13–14.[18]

*Procedural Infirmities*

■ Plaintiff claims that Intermediary Letters 77–33 and 78–9 are invalid because they were not promulgated in accordance with the rulemaking requirements of the Administrative Procedure Act. This argument lacks merit. While the APA does require notice of proposed rulemaking and opportunity for comment by the public, these formalities apply solely to substantive regulations, and do not embrace " . . . interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" 5 U.S.C. § 553(b)(A). The letters seeking cost information merely constitute the procedural mechanism by which the Secretary is implementing the Medicare statutes and the regulations promulgated thereunder. Containing no new substantive matter, these letters clearly fall within the category quoted above and hence are exempt from the rulemaking requirements of the APA. *See Continental Oil Company v. Burns*, 317 F.Supp. 194, 197 (D.Del.1970).

■ We also reject plaintiff's contention that the failure to publish the December 30th regulations thirty days prior to their

18. The January 4, 1978 memorandum containing the views of the Public Health Service towards the December 30th regulations do not affect our decision.

**116**

effective date renders them invalid. Section 553(d) of the APA permits an immediate effective date of substantive rules when good cause exists. The mandate of the Court of Appeals in *Schupak v. Mathews, supra,* that the regulations be promulgated sixty days from November 2, 1977 clearly constitutes good cause for dispensing with this requirement.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss the complaint, treated by this court as a motion for summary judgment, is granted. Plaintiff's motion for a preliminary injunction and defendant's motion to transfer the action to the District Court for the District of Columbia are denied as moot.

The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff dismissing the complaint and it is

SO ORDERED.