In re Norman C. TURLEY and
Dorian Turley, Debtors.

THOMAS C. THOMPSON SPORTS,
INC., Appellant,

v.

FARMERS AND MERCHANTS BANK
OF LONG BEACH, Appellee.

No. CV–96–1557–AAH.
Bankruptcy No. LA93–40553 TD.
Adversary No. LA94–03054.

United States District Court,
C.D. California.

Aug. 1, 1997.

David S. Elder, Gardere, Wynne, Sewell & Riggs, LLP, Houston, TX, for Appellant.

Michael Leight, Seal Beach, CA, for Appellee.

DECISION AND ORDER AFFIRMING THE ORDER AND JUDGMENT OF THE UNITED STATES BANKRUPTCY COURT GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT, CROSS–CLAIMANT AND COUNTERCLAIMANT FARMERS AND MERCHANTS BANK OF LONG BEACH

HAUK, Senior District Judge.

## INTRODUCTION

This matter comes before this Court on appeal from the United States Bankruptcy Court. The Appellant, Thomas C. Thompson Sports, Inc. ("TCT"),[1] seeks reversal of the following actions and decisions of the bankruptcy court:

(1) The March 14, 1995 "Order Granting The Motion Of Defendant, Cross–Claimant And Counterclaimant, Farm-

---

1. TCT is a Texas corporation authorized to and doing business in Texas, with its principal place of business in Houston.

ers And Merchants Bank Of Long Beach, For Summary Judgment, And Denying The Motion Of Defendant, Thomas C. Thompson Sports, Inc., For Summary Judgment"; and reiterating the purpose of this Order,

(2) The March 29, 1995 "Judgment In Favor Of Defendant, Cross–Claimant And Counterclaimant, Farmers And Merchants Bank Of Long Beach, On Motion For Summary Judgment."

In proceedings in interpleader before the bankruptcy court were Defendants, Cross–Claimants, Counterclaimants, and adverse interpleaded parties Appellant TCT and Appellee Farmers And Merchants Bank Of Long Beach ("Bank").[2] At issue in this lien priority dispute was whether the interpleaded monies payable by Championship Autoracing Teams ("CART")[3] to Debtor Norman C. Turley ("Debtor")[4] were: (a) proceeds of a "certificated security," as argued by Appellee; or (b) proceeds of the Debtor's CART franchise, which is a "general intangible" under the Commercial Code, as argued by Appellant.

The bankruptcy judge decided those issues in favor of the Bank and against TCT, awarding all interpleaded funds to the Bank. The bankruptcy court held that the interpleaded funds CART owes Debtor are not "general intangibles" that represent the proceeds from a terminated "franchise agreement," but are instead best defined as the proceeds from a CART share of stock that Debtor pledged to the Bank. The court concluded that the Bank had a perfected security interest in this "certificated security" upon the delivery of the CART share certificate to the Bank.

For the reasons stated below, the United States Bankruptcy Court's decision is AFFIRMED.

## I. FACTS

Debtor Norman C. Turley was in the business of racing Indy cars and was doing business as Personal Investment Group ("P.I.G."). In February 1991, CART's predecessor in interest, Championship Auto Racing Teams Properties, Inc.,[5] granted P.I.G. an alleged "franchise." (Rec. 1,[6] Interpl. Compl., Ex. 1 at 1–4.) Pursuant to their purported "franchise agreement," Debtor was entitled to receive funds from CART based upon the number of CART-sanctioned races in which Debtor participated. The "franchise" was granted on a year-to-year basis and Debtor was required to re-apply each year. Debtor was also given one share of stock in CART. The share certificate stated that the stock could not be transferred or assigned without CART's legal counsel's written consent (*See* Rec. 9, Ex. F.)

On December 15, 1992, in consideration for a $500,000 loan from TCT, Debtor executed a security agreement covering all of Debtor's accounts receivable, general intangibles, and other property (the "Collateral"). (Rec. 1, Ex. 1 at 4.) TCT alleges its lien was perfected by the filing of an appropriate UCC–1 Financing Statement[7] with Secretary of State of California on or about March 12, 1993. (*See* Rec. 7, App. 1.) In addition, Debtor signed a letter directing CART to pay to TCT "all prize money, franchise money, redemption amounts (including amounts attributable to Turley's franchise rights and stock relating to or in CART) and all other funds and disbursements attributable to" Debtor.

---

**2.** The Bank is a banking corporation organized and existing pursuant to the laws of the State of California.

**3.** CART is a corporation organized and existing pursuant to the laws of the State of Michigan.

**4.** Although this bankruptcy case involves two debtors, Debtor in the singular refers to Mr. Norman C. Turley, the person who was apparently in charge of most of the Debtors' financial arrangements involving CART, P.I.G., Bank, TCT, and Turley, Inc.

**5.** A Michigan non-profit corporation. References to any actions taken by CART also refers to

any transactions, conveyances, agreements, or so forth, made by CART Properties, Inc.

**6.** "Rec. 1," for example, refers to the record on appeal at tab 1 of Appellant's "Index Of Appellate Record."

**7.** A form to be filed with the Secretary of State that gives the names of the debtor and secured party, is signed by the debtor, gives an address of the secured party, lists a mailing address for the debtor, and contains a statement indicating the types, or describing the items, of collateral. *See* Cal. Com.Code § 9402 (West 1990).

(Rec. 13, TCT's Mot. For Summ.J., Ex. E.) In reply to Debtor's letter, CART apparently consented to the pledge in favor of TCT and acknowledged that it would pay TCT all sums attributable to the stock and franchise. (Rec.13, Ex. F.) Debtor did not, however, deliver the CART share certificate to TCT.

On or about February 8, 1993, Debtor executed a General Pledge Agreement that gave the Bank an Irrevocable Stock or Bond Power with respect to Debtor's one share of capital stock in CART, and physically delivered the stock and pledge agreement to the Bank. (Rec.1, Interpl.Compl., Ex. C.) Debtor also drafted a letter directing CART to surrender Debtor's share of stock in CART and to remit the amount of $220,000 to the Bank. This letter was apparently not delivered to CART by the Bank. (Rec. 1 at 4–5; Rec. 13, Ex. E.)

On August 25, 1993, Debtor filed Chapter 11 bankruptcy. Debtor's bankruptcy schedule attributed a $220,000 value to his CART franchise and no value to his stock ownership. (Rec. 33, Turley Decl., Ex. C at 2; see also Rec. 23, TCT Reply Memo. at 3, n. 2.) However, in January 1994, while Chapter 11 cases were still pending, CART's Board of Directors voted to redeem Debtor's share of stock in CART for the sum of $220,000, plus an additional distribution of $29,394 attributable to Debtor's stock. (Rec. 1, Interpl. Compl.; Rec. 9, Mills Decl. at 23.)

In March of 1994, TCT filed a motion for relief from stay seeking to foreclose its liens on the Collateral pledged to TCT. Evidentiary hearings were held with respect to this issue. On May 25, 1994, the bankruptcy court filed its Findings Of Fact And Conclusions Of Law. (Rec. 6, TCT's Req. For Jud. Not., Ex. A.) In its Findings, the bankruptcy court stated that all of the monies CART owed to Debtor constituted a "general intangible" under the Commercial Code and TCT had perfected a lien on such monies. An order modifying the automatic stay and permitting TCT to foreclose its liens was also signed. In July of 1994, CART filed an interpleader complaint regarding the $249,394 (plus any interest) [8] it held as proceeds of

the stock redemption and certain distributions. The matter was then assigned an Adversary case number. Thereafter, both the Bank and TCT moved for summary judgment. The bankruptcy court granted summary judgment in favor of the Bank as to all interpleaded funds and denied TCT's motion for summary judgment

## II. STANDARD OF REVIEW

A district court has jurisdiction to hear an appeal taken from a final judgment, order, or decree of a bankruptcy judge sitting in that court's judicial district. 28 U.S.C. § 158(a) (West Supp.1997). An appeal under this section "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district court." *Id.* § 158(c)(2).

An appellate court should affirm a lower court's grant of summary judgment if, viewing the facts in a light most favorable to the non-moving party, there are no genuine issues of material fact in dispute and summary judgment is appropriate as a matter of law. *Iolab Corp. v. Seaboard Surety Co.,* 15 F.3d 1500, 1503–4 (9th Cir.1994).

Both parties agreed at the July 14, 1997 hearing in this Court that there are no genuine issues of material fact in dispute and this Court must make a decision as a matter of law. (*See* Rep.'s Tr. 7/14/97 (counsel for Appellant and counsel for Appellee agreeing with the Court that there are no issues of fact in dispute since both parties have moved for summary judgment).) The Court now turns to those legal issues.

## III. DISCUSSION

**A. The Monies Interpleaded By CART Represent The Proceeds From A Redeemed Certificated Security In Which The Bank Has A Perfected Security Interest.**

The essence of this appeal is whether TCT or the Bank has the right to the CART interpleaded funds. TCT argues that although CART issued share certificates to franchise holders like Debtors, these shares of stock merely represented franchise inter-

---

8. The interpleaded monies at issue were not deposited with the United States Bankruptcy Court, but are instead currently earning interest in an interest bearing bank account. (*See* Rep.'s Tr., 7/14/97.)

ests in CART. TCT further contends that a "franchise" is a "general intangible" according to the Commercial Code, *see In re Topsy's Shoppes, Inc.*, 131 B.R. 886, 888–89 (D.Kan.1991), and a security interest in a general intangible can only be perfected by the filing of an appropriate UCC–1 Financing Statement. *See* Cal. Com.Code §§ 9302(1), 9401(1)(c) (West Supp.1996).[9] After loaning Debtors § 500,000, TCT claims to have perfected its security interest in this alleged general intangible upon the filing of an appropriate financing statement. (*See* Rec. 7, App. 1.)

The Bank, on the other hand, argues that the interpleaded monies represent the proceeds from a "certificated security" in which it has priority. It is the Bank's claim that Debtor's "share of stock" in CART was collateral for a loan to Debtor, and that the Bank's interest in any proceeds from that stock was secured when the share certificate was delivered into its possession. *See id.* §§ 8102, 8321 (West Supp.1996).

Thus, the issue here is whether the interpleaded monies from CART represent the proceeds from a franchise termination or a redemption of a certificated security.

In addition, although there were substantial changes to Article 8 of the Commercial Code that became effective on January 1, 1997, this case is governed by the provisions of the former Commercial Code since this matter was commenced long before those changes took effect. *See id.* § 603(a) (West Supp.1997) (stating that Article 8 of the Commercial Code "does not affect an action or proceeding commenced before this division becomes operative").

### 1. The CART share certificate is a certificated security.

██ California Commercial Code § 8102 defines and regulates certificated securities. Section 8102(1)(a) states that a "certificated security" is a "share, participation, or other interest in property or an enterprise of the issuer or an obligation of the issuer which is all of the following: (i) Represented by an instrument issued in bearer or registered form; (ii) Of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and (iii) Either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations." Cal. Com.Code § 8102 (West Supp.1996).

TCT argues only that Debtor's share of stock in CART is not a certificated security because it is not of a type commonly dealt in on securities exchanges or markets. However, the Official Reasons for prior statutory changes to § 8102 state that the "remaining language of" subparagraph (ii) is intended to cover such interests as the stock of closely held corporations which, although not in fact dealt in on exchanges or markets, is 'of a type' that is." *Id.*, U.C.C. Off. Reas. for 1977 Change (West 1990). The CART stock is certainly "of a type" dealt in as a medium for investment since Debtor was to receive disbursements from CART based upon his holding an interest in the corporation.[10] (Rec. 13, Turley Decl. at 4–5.)

Moreover, CART's general counsel has acknowledged that Debtor held "stock" in CART. (*See* Rec. 6, Mills Decl. at 22–23 (stating that "Debtor now holds one share of stock in CART by virtue of their share in CART Properties").) Therefore, because Debtor's share certificate in CART represents a share of stock in an enterprise for the purpose of investment, that share of stock is a "certificated security" under the Commercial Code.

### 2. The Bank perfected its security interest in the "certificated security," and in all the benefits derived from the share, by taking possession of the share certificate.

██ Because the Bank took possession of the CART share certificate upon delivery of

---

**9.** California law is controlling here because the "law (including the conflict of law rules) of the jurisdiction in which the debtor is located governs the perfection and the effect of perfection or nonperfection of [a] security interest." Cal. Com.Code § 9103 (West Supp.1996).

**10.** In fact, neither TCT nor CART have unequivocally argued or stated that Debtor did not hold a "certificated security" or "share of stock" in CART, but have instead only occasionally referred to Debtor as a franchisee of CART.

the loan to Debtor, the Bank has a perfected security interest in the interpleaded proceeds from the redemption of that share.

California Commercial Code § 8321 governs the perfection of security interests in all securities, certificated and uncertificated. Section 8321(1) states that a security interest in a share of stock is "enforceable and can attach only if both: (a) *the security, if certificated, is in the possession of the secured party pursuant to agreement,* or, as to any other certificated security and any uncertificated security, the debtor has signed a security agreement which contains a description of the collateral; and (b) *the security is transferred to the secured party* or person designated by him or her." Cal.Com.Code § 8321(1) (West Supp.1996) (emphasis added); *see also In re Marriage of Braendle,* 46 Cal.App.4th 1037, 1043, 54 Cal.Rptr.2d 397 (1996).

On February 8, 1993, Debtor Norman C. Turley executed a general pledge agreement which granted the Bank a security interest "in all money and property this day delivered to and deposited with the Bank, and all money and property ... which shall ... come into the possession, custody or control of Bank." (Rec.1, Ex. C.) On that day the Bank also took possession of the share certificate. Therefore, pursuant to Commercial Code § 8321(1)(a)-(b), the Bank perfected its security interest in the CART share of stock at the time Debtor transferred the share certificate to the Bank and upon the Bank's possession and control of that certificate.[11]

### 3. Debtor was not a "franchisee" of CART.

█ TCT believes that it has a priority lien with respect to the proceeds from the redemption of Debtor's alleged franchise interest in CART because a security interest in a franchise is a general intangible. TCT argues that it has secured its interest in this general intangible because a proper UCC–1 Financing Statement evidencing its security interest was filed with the Secretary of State before a Financing Statement evidencing the Bank's security interest was filed. Unfortunately for TCT, Debtor's interest in CART cannot be defined as a franchise interest.

A "franchise," according to the Franchise Investment Laws in effect at the time of the P.I.G.-CART relationship, is defined as "a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which: (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; (2) the operation of the franchisee's business pursuant to such a plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and (3) the franchisee is required to pay, directly or indirectly, a franchise fee." *See* Cal. Corp.Code § 31005(a) (West Supp.1996).

Debtor, however, was not granted the right to "engage in the business of offering, selling or distributing goods or services." Moreover, under the purported Franchise Membership agreement between P.I.G. and CART Properties, Inc., Debtor was to receive periodic payments from CART based upon the number of races in which the Debtor participated. (Rec. 13, Turley Decl. at 2.) This "return" from Debtor's agreement with CART appears to represent a "medium for investment" like stock, as opposed to a franchise agreement in which a franchisee pays franchise fees to the franchisor.

Additionally, the offering and selling of a franchise in California, for example, is regulated by California's Franchise Investment Laws. *See* Cal. Corp.Code §§ 31000–31516 (West Supp.1996). Sections 31110 and 31111 require registration of franchise offerings with the Commissioner of Corporations. *Id.* §§ 31110–11. CART is not registered in California under the Franchise Investment

---

11. Contrary to TCT's assertions, it does not matter that the share certificate in the Bank's possession was issued by CART Properties, Inc., and not CART, since CART, Inc. and CART Properties, Inc. merged to form what is now known simply as CART. Moreover, CART's general counsel stated in his declaration that "Debtor now holds one share of stock in CART by virtue of their share in CART Properties." (Rec. 9, Mills Decl. at 22.)

Law, nor has TCT offered any evidence that it is registered in any other state.[12] In other words, CART has not proffered any evidence suggesting that CART and Debtor had what is statutorily recognized as a franchisee-franchisor relationship. Thus, the foregoing further substantiates Appellee's argument that Debtor was more like a shareholder in CART than a franchisee of CART.

### 4. TCT lacks standing to enforce the transfer restrictions on the CART stock.

 TCT also argues that the Bank does not have a security interest in the CART share of stock because Debtor's stock transfer to the Bank was void. TCT correctly contends that the CART share certificate Debtor delivered to the Bank conspicuously stated that such transfers are restricted unless "prior written approval of legal counsel of the issuing Corporation is affixed to [the] certificate." (*See* Rec. 9, Ex. F at Art IV, § 4.)

CART was incorporated and is operating under the laws of the state of Michigan, and these types of restrictions are valid and enforceable under Michigan law. *See* Mich. Comp. Laws Ann. § 440.8204 (West 1997).[13] CART, however, has not formally approved this stock transfer.

Unfortunately for TCT, as a mere creditor of Debtors, it does not have standing to enforce the transfer restrictions. U.C.C. Of-

ficial Comment 5 of Commercial Code § 8204,[14] which concerns the effect of an issuer's restrictions on the transfer of securities, states that transfer restrictions are to be enforced in order to protect the issuer and its shareholders' interests, but it does not state that these restrictions should be enforced by other parties. Cal. Com.Code § 8204, cmt. 5 (West 1990).

TCT fails to point to any authority which states that a creditor of a transferor of stock has standing to enforce the transfer restrictions stated on the transferor's share certificate. CART, who as the issuer of the stock has standing to enforce its own transfer restrictions, has not attempted to restrict the stock transfer between the Bank and Debtor. In fact, the only reason why CART has not yet disbursed the proceeds from the stock redemption is because it has not "received the share of stock." (Rec. 9, Mills Decl. at 24.)

In its brief TCT cites to *Tu–Vu Drive–In Corp. v. Ashkins,* 61 Cal.2d 283, 287, 391 P.2d 828, 830, 38 Cal.Rptr. 348, 350 (1964), in support of the argument that the stock transfer to the Bank was void. In *Tu–Vu,* the California Supreme Court held that an issuing corporation could enforce its own transfer restrictions. *Id.* In the instant case, however, the issuing corporation is not seeking enforcement of the transfer restrictions. Only a mere creditor of the transferor seeks enforcement of those restrictions, and Appel-

**12.** Furthermore, the California Franchise Relations Act (Cal. Bus. & Prof.Code §§ 20000–20043 (West Supp.1996)), enacted in 1980, regulates the termination and non-renewal of franchises. CART did not comply with this Act because neither its directors nor its officers notified Debtor of CART's decision to terminate the alleged franchise—and instead redeem Debtor's stock—at least 180 days prior to the termination of Debtor's purported franchise agreement with CART. *See* Cal. Bus. & Prof.Code § 20025.

**13.** Section 8106 of the California Commercial Code states that the "law of the jurisdiction of organization of the issuer governs the validity of a security." This section "requires that in actions regarding the rights and duties of an issuer of securities with respect to registration of transfer of a certificated security a court should apply the substantive and choice of law rules of the jurisdiction in which the issuer is incorporated." *See Catizone v. Memry Corp.,* 897 F.Supp. 732,

735 (S.D.N.Y.1995) (discussing choice of law principles under U.C.C. § 8106). The Official Comments to the recent revisions to the Commercial Code further clarify the policy behind the rule: "The principal policy reflected in the choice of law rules in [our revised subsections] is that an issuer and others should be able to look to a single body of law ... rather than having to look to the law of all of the different jurisdictions in which security holders may reside." *Yuen v. U.S. Stock Transfer Co.,* 966 F.Supp. 944, 950 (C.D.Cal.1997) (citing U.C.C. § 8110, Official Comm. to the 1994 Revision). Therefore, in our case *Michigan law is controlling* with regard to the enforcement of transfer restrictions because Michigan is the jurisdiction in which CART is incorporated and doing business.

**14.** Michigan has adopted the Uniform Commercial Code. *See* Mich. Comp. Laws Ann. § 440, Prec. 440.1101, Refs. & Annos. (West 1997).

lant has not argued that a creditor has standing to enforce those restrictions.

TCT also cites to *Adler v. Hill (Matter of Hill)*, 981 F.2d 1474 (5th Cir.1993), a case in which a shareholder tried to pledge a share of corporate stock to a bank even though the issuing corporation's articles of incorporation stated that the shares could not be transferred without first being offered to the remaining shareholders. The court ruled that the trustee had derivative standing to challenge the validity of the transfer because he was acting on behalf of a remaining shareholder in the corporation that issued the restricted stock. *Id.* at 1478, 1488. In the instant case, however, as stated before, a mere creditor of the debtors seeks enforcement of the stock transfer restrictions against a competing creditor. Since TCT is not acting on behalf of the issuing corporation or its shareholders, it certainly does not have the "derivative standing" to enforce the transfer restrictions that the Fifth Circuit found the trustee had in *Matter of Hill.*[15]

Moreover, in another bankruptcy case, a Tennessee bankruptcy court found that persons who are not the beneficiaries of a restrictive transfer provision do "not have standing to challenge [a] debtor's pledge" as violative of the transfer restriction. *See In re Crabtree*, 48 B.R. 528, 533 (Bankr. E.D.Tenn.1985). Therefore, for the purposes of this appeal, the Court finds that Debtor's pledge of CART stock to the Bank is valid because TCT is without standing to challenge that conveyance.

### B. The Bankruptcy Court's First Decision Favoring TCT Does Not Control This Case

Appellant contends that the bankruptcy court's May 25, 1994 Findings Of Fact And Conclusions Of Law as to TCT's rights to certain monies held by CART was the "law of the case" and therefore should control all

subsequent litigation. In that decision by Bankruptcy Judge Alberts—which served as his findings regarding a March 31, 1994 hearing on TCT's Motion For Relief From Stay—the court held that the share certificate in CART held by Debtor was a "general intangible" and not a "certificated security." It is therefore Appellant's contention that the subsequent summary judgment entered in favor of the Bank by Bankruptcy Judge Donovan improperly revisited the question of whether the value of the shares the Debtor held in CART was actually a "franchise right," and thus a "general intangible" that should go to TCT, or a "certificated security" that should go to the Bank.

■ The Supreme Court defines "law of the case" as a doctrine which "posits that a decision should continue to govern the same issues in subsequent stages in the same case." *See Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). The purpose of such a rule is to save judicial resources and protect adversaries from having to continuously defend against vexatious litigation concerning the same issues previously adjudicated. *Id.* at 619, 103 S.Ct. at 1391–92. If all jurists read this rule of law very strictly, Appellant would appear to have a strong argument in its favor.

■ The "law of the case" doctrine, however, is not a precise rule of procedure. "Unlike the more precise requirements of res judicata, law of the case is an amorphous concept." *Arizona*, 460 U.S. at 618, 103 S.Ct. at 1391. Moreover, the "law of the case" doctrine only "directs a court's discretion, it does not limit the tribunal's power." *Id.* (citations omitted). In fact, the Supreme Court has noted that it is proper for a court to depart from a prior holding if convinced that it is "clearly erroneous and would work a manifest injustice." *Id.* at 619 n. 8, 103 S.Ct. at 1391 n. 8 (citing *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.1967)).[16]

---

**15.** Additionally, TCT did not *directly* address the standing issue in Appellant's Brief nor in its Reply Brief.

**16.** Furthermore, the focus of the *White* Court's reasoning concerned cases in which an appeals court had rendered a decision and remanded that case to the trial court. In the instant case,

however, a bankruptcy judge in a subsequently docketed Adversary case merely corrected the initial findings of the first bankruptcy judge who was assigned this matter.

Other courts have explained that because the "doctrine should not constitute a mandate to adhere to a previous erroneous decision, we believe that the doctrine should cause a court to change a prior ruling in a case [ ] where that ruling is 'clearly erroneous' and it 'would work a manifest injustice' to adhere to it." *Cole v. Sovran Mortgage Corp. (In re Cole)*, 89 B.R. 433, 436 (Bankr.E.D.Pa.1988) (citations omitted).

 Similarly, state-court judgments have preclusive effect in federal courts only if the parties had a "full and fair opportunity" to litigate the claim. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1896–98, 72 L.Ed.2d 262 (1981) (discussing res judicata principles); *see also Clements v. Airport Auth. Of Washoe County*, 69 F.3d 321, 330 (9th Cir.1995) (holding that the doctrine of issue preclusion bars relitigation of an issue only if the issue "has been *actually* litigated and *necessarily* decided") (emphasis in original). In our case, however, the Bank did not have a full and fair opportunity to litigate the lien priority issue that is presently on appeal in this Court.

According to the lower court record on appeal, the Bank was not an adversary in the hearing that preceded Bankruptcy Judge Alberts' findings regarding the CART stock.[17] It would have been manifestly unfair for the bankruptcy court, after an Adversary case number had been assigned, to disregard the arguments raised by the Bank in its motion for summary judgment when the Bank had previously been foreclosed from fully arguing those issues at the March 31, 1994 Relief From Stay hearing. In other words, the summary judgment hearing was the first opportunity the Bank had to be fully heard on the issue regarding the "legal status" of the CART share certificates. Moreover, the Bank was told at that first hearing that it would not be bound by that court's decision because it was not a party to that motion. (*See* Rec. 8 at 12–14.) For this Court to conclude that Bankruptcy Judge Alberts' Findings control the litigation would be in-

consistent with the purpose of the "law of the case" doctrine, which posits: "[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted to battle for it again." *Schupak v. Califano*, 454 F.Supp. 105, 114 (E.D.N.Y.1978) (citations omitted). In this case, however, the litigants did not "battle" at the first proceedings involving Debtors' bankruptcy because counsel for the Bank was not allowed to interject himself into the hearing once the court concluded that it was not going to "resolve any tensions between the bank" and TCT. (*See* Rec. 8 at 12.)

Appellant is asking this Court to reverse the bankruptcy court's entry of summary judgment in favor of the Bank because the issue had already been decided in Appellant's favor after a prior hearing. Such an application of the "law of the case" doctrine, however, would unnecessarily bind courts to decisions that had been rendered in earlier proceedings even if those decisions were legally unsound and one of the parties was unable to fully participate in the hearing preceding those decisions. Such an application of this doctrine would be manifestly unjust and simply cannot be right.

**C. TCT's Appeal Of The Bankruptcy Court's Orders Was Properly Stated**

 TCT's appeal from the order of rehearing regarding entry of summary judgment in favor of the Bank, upon a fair reading of the substance of the papers, is an appeal from the order granting summary judgment. TCT argues in its briefs that the bankruptcy court incorrectly found that no error had been made when summary judgment was entered in favor of the Bank. In essence, TCT's appeal of the bankruptcy court's motion for rehearing is an appeal of the bankruptcy court's order granting summary judgment. The Bank's argument that the bankruptcy court's entry of summary judgment should be affirmed because TCT has appealed from the order for rehearing, but has written a brief regarding the order

---

**17.** The Bank was not a party to the March 31, 1994 Relief From Stay hearing, and thus all adversarial issues related to the Bank's interests

were not made known to the bankruptcy court. (*See* Rec. 8 at 12–14.)

entering summary judgment in favor of the Bank, is a matter of form over substance and is without merit.

Moreover, based upon the reasoning in Parts IIIA–B, *supra,* this issue is moot since this Court has already concluded that the bankruptcy court's entry of summary judgment in favor of the Bank should be affirmed.

## IV. CONCLUSION AND ORDER

This Court having considered all pleadings and papers on file herein and after having heard the arguments of counsel, and good cause appearing therefor, IT IS HEREBY ORDERED AS FOLLOWS:

(1) The United States Bankruptcy Court's March 14, 1995 Order and March 29, 1995 Judgment, both in favor of the Bank, shall be and hereby are AFFIRMED; and

(2) The Clerk of the Court shall file and enter this Decision And Order and shall serve a copy hereof on all counsel of record herein.