**WABCO TRADE COMPANY, DIVISION OF WORLD STANDARD EXPORT, LTD., Plaintiff,**

v.

**S.S. INGER SKOU and S.S. Amaryllis, their engines, boilers, etc., GCC Shipping Co., Ltd. d/b/a Constellation Line, and Constellation Navigation, Inc., Defendants.**

No. 77 Civ. 4299 (RWS).

United States District Court,
S. D. New York.

Oct. 24, 1979.

As Amended Nov. 30, 1979.

Donovan, Maloof, Walsh & Kennedy, New York City, for plaintiff; Donald M. Kennedy, Gerard S. Doyle, Jr., New York City, of counsel.

Burlingham, Underwood & Lord, New York City, for GCC Shipping Co., Ltd. and Constellation Navigation, Inc.; James W. Lynch, New York City, of counsel.

## OPINION

SWEET, District Judge.

Wabco Trade Company ("Wabco"), a Delaware Corporation has sued GCC Shipping Co., Ltd. ("GCC"), a Greek corporation, and Constellation Navigation, Inc. ("Constellation"), a New York corporation, for damages in the amount of $212,984.96, plus interest and the cost of this action, resulting from the loss of four motor graders. This court has subject matter jurisdiction under 28 U.S.C. § 1332 and Rule 9(h), Fed.R.Civ.P.

The parties have stipulated to most of the operative facts, and those that are contested have been decided upon the submission of exhibits. This court finds that plaintiff shipped four motor graders from Charleston, South Carolina aboard the S.S. INGER SKOU, bound for Beirut, Lebanon. Defendant GCC was the common carrier for transport of the motor graders from Charleston. Constellation was the agent of GCC, and issued a negotiable bill of lading for the shipment of Wabco's four motor graders.

Due to political disturbances in Beirut, the INGER SKOU discharged plaintiff's motor graders at Piraeus, Greece on or about October 20, 1975. Shortly thereafter, Constellation sent the following undated letter to Wabco:

Dear Sirs:

We very much regret to advise that because of the current state of affairs in Beirut we have been compelled to discharge the captioned cargo at Piraeus, Greece. While we have taken this step pursuant to our rights under clauses 5 and 6 of the bill of lading, and reserve all of our rights under said bill of lading and those clauses, it is our intention for the time being to bear the expense of storage at the Piraeus Free Zone in the hope that the situation in Beirut will stabilize in the reasonably near future and the cargo can be reloaded onto one of our vessels and transshipped to Beirut. Although we shall pay the cost of storage, all risk during this storage is and will continue to be for the account of cargo.

If there is any change in this arrangement, or if final delivery will in fact have to be made at Piraeus, we shall notify you.

Exhibit 62.

On December 3, 1975, Wabco instructed Constellation to hold the motor graders in Piraeus until Wabco advised Constellation of a further destination. (Exhibit 68). Orestes Christophides, Constellation's manager and part owner, testified that he forwarded a photocopy of plaintiff's letter to GCC in Greece and that he agreed orally that GCC would hold the goods in Piraeus. (Christophides Dep. p. 52). GCC made no written reply, but did hold the graders in Piraeus for three months following Wabco's request on December 3.

In early March, 1976, GCC, without notifying Wabco or the consignee designated in the bill of lading, transshipped the goods from Piraeus to Beirut on board the S.S. AMARYLLIS. The graders arrived in Beirut on March 11, 1976; GCC's agent in Beirut took custody of the goods and delivered them to the Beirut Port Authority in exchange for a warehouse receipt.

The evidence indicates that Wabco did not learn of any change in status of its goods until March 26, 1976, over two weeks after arrival of the goods in Beirut. Wabco did not verify that its goods had been sent on until March 31, 1976, over three weeks after the date of shipment from Piraeus.

The government warehouse in which the graders were bailed was apparently ransacked, the graders seized, and, despite efforts by the parties, were never recovered. There is some suggestion that they were used as armored vehicles during the civil disorder.

GCC, the carrier, has asserted that the bill of lading remained in force following the discharge of the graders in Piraeus, and that GCC acted in accordance with the bill in transshipping the goods to Beirut. Wabco, the shipper, has urged that the contract of carriage contained in the bill of lading was terminated when the graders were discharged in Piraeus and notices were exchanged by GCC and Wabco and that the subsequent onshipment to Beirut constituted an unjustified conversion. In light of the unique circumstances presented here, GCC will bear the damages resulting from the loss of the graders.

GCC relies upon clauses 6(a)[1] and 7[2] of the original bill of lading. These clauses

1. Clause 6(a) of the bill provided:
 6. (a) In any situation . . . during the voyage, which in the carrier's judgment may give rise to risk of damage, delay or disadvantage to the ship . . . or make it imprudent to . . . continue the voyage, or to enter or discharge at any port . . . the carrier . . . may discharge the goods into depot, . . . or may proceed or return . . . to such other port or place as the carrier may select and discharge the goods or any part thereof there; . . . or may forward or transship the goods by any means, but always at the risk and expense of the goods; or may require the ship-

per or consignee to take delivery at port of shipment or elsewhere, and if he has to do so, carrier may warehouse, store or hold the goods.
 (Exhibit 61).

2. Clause 7 of the bill provided:
 7. Whenever the carrier . . . may deem it advisable or in any case where the goods are consigned to a point where the ship does not expect to discharge, the carrier or master may, without notice, forward the whole or any part of the goods, before or after loading at the original or at any intermediate port of shipment or at any other

permit the carrier to divert cargo to an unscheduled port to avoid risk of damage to the ship, to store the goods at shipper's expense, and to act as forwarding agent in transshipping the goods by any means. GCC urges that it did no more than fulfill its duties under its contract of carriage by discharging the goods in Piraeus, holding them for four months, and then transshipping to Beirut without further notice to Wabco.

In fact, the parties agreed otherwise, and the contract of carriage was terminated in Piraeus. When GCC notified Wabco that it had discharged the goods in Piraeus in late October, it stated that it intended to ship the goods on to Beirut "in the reasonably near future." GCC specified that although it would pay the cost of storage "for the time being," "all risk during this storage is and will continue to be for the account of cargo." (Exhibit 62).

 Apparently in response, on December 3, 1975, Wabco notified GCC through its agent, Constellation, to hold the goods in Piraeus until further notice. GCC's agent agreed orally that GCC would hold the goods in Piraeus and notified GCC. Thereafter, GCC held Wabco's goods in Pi-

> place . . . even beyond the port of discharge or the destination of the goods, by any vessel. . . . The carrier, in making any arrangements for transshipment under the bill of lading by any means of transportation not operated by it, shall be deemed the forwarding agent of the shipper and consignee without any other responsibility whatsoever. . . . Pending or during transshipment the goods may be stored ashore or afloat at their risk and expense.
> (Exhibit 61).

**3.** A written contract such as the bill of lading may be modified orally. *Commercial Contractors, Inc. v. U. S. Fidelity & Guaranty Co.*, 524 F.2d 944, 952 (5th Cir. 1975); *Neonex Intern. Lt'd v. Norris Grain Co.*, 338 F.Supp. 845, 853 (S.D.N.Y.1972). Termination of a contract by mutual consent is valid where the termination is supported by valid consideration. *Coca-Cola Bottling Co. of Steamboat Springs v. Coca Cola Co.*, 447 F.2d 635, 637–38 (10th Cir. 1971); *Carolina Metal Products Corp. v. Larsen*, 389 F.2d 490, 494 (5th Cir. 1968). In this case the consideration requirement was met, since GCC was relieved of its obligation to transship the goods to Beirut. Even in the absence of such

raeus for over three months without protest or request for further instructions. In view of these transactions, the parties agreed to terminate the original bill of lading as of December, 1975. There was a mutual assent to the new arrangement proposed by Wabco whereby GCC would hold the goods in Piraeus until Wabco advised it of further plans.[3] GCC's onshipment of the graders represented not an attempt to comply with its original contract of carriage, but rather an inadvertent error in violation of its new agreement.[4]

GCC has further contended that under the Federal Bills of Lading Act, 49 U.S.C. §§ 81–124, it had no choice but to deliver the goods in accordance with the terms of the bill and that as long as the negotiable bill of lading remained outstanding, it acted at its peril in complying with the instructions of the shipper, Wabco. While GCC had a right to demand the surrender of the bill of lading from Wabco in order to protect itself from liability to a good faith purchaser of the bill, GCC chose not to do so and never questioned Wabco's ownership of the goods or possession of the bill of lading.

Furthermore, Section 90 of the Bills of Lading Act provides:

> consideration, the contract termination would be enforceable due to Wabco's change in position in reliance on GCC's assent. *See Schmidt v. McKay*, 555 F.2d 30, 36 (2d Cir. 1977); *Arnold's Hofbrau Inc. v. George Hyman Const. Co., Inc.*, 156 U.S.App.D.C. 253, 256, 480 F.2d 1145, 1148 (D.C.Cir. 1973).

**4.** Indeed Constellation admitted GCC's error in a letter to Wabco dated August 6, 1976, in which it stated,

> We had received, prior to the forwarding of this cargo on the AMARYLLIS, written instructions to hold the cargo involved in Piraeus and a copy of this letter was sent to our Piraeus office. Unfortunately, for some reason which I cannot ascertain, the cargo was not held but was on-carried to Beirut as per the original bill of lading.

Thus, although GCC has contended that the onshipment was a good will gesture performed in accordance with the original bill of lading, it is clear that the parties were aware that no onshipment was appropriate and that the original bill of lading had been terminated.

Where a carrier delivers goods to one who is not lawfully entitled to the possession of them, the carrier shall be liable to anyone having a right of property or possession in the goods if he delivered the goods [other than to a person in possession of an order bill for the goods indorsed to him]; and, though he delivered the goods [to such a person], he shall be so liable if prior to such delivery he—

(a) Had been requested by or on behalf of a person having a right of property or possession in the goods, not to make such delivery

. . . . .

Such request or information, to be effective . . ., must be given to an officer or agent of the carrier . . . in time to enable the officer or agent to whom it is given, acting with reasonable diligence, to stop delivery of the goods. 49 U.S.C. § 90. The Act permits a person having a right of possession in goods to exercise a right of stoppage in transit. If the carrier delivers goods—even to the holder of a negotiable bill of lading—in violation of the owner's request, it is liable for loss of the goods. Accordingly, even if GCC's contention that the bill of lading was not terminated prior to transshipment were accepted, GCC would still not have been justified in delivering the goods to Beirut, in contravention of Wabco's instructions.

A conversion is a "disposition of the property of another, without right, as if it were [one's] own." *United States v. Santiago*, 528 F.2d 1130, 1135 (2d Cir.), *cert. denied*, 425 U.S. 972 (1976); *Banker's Life Ins. Co. of Nebraska v. Scurlock Oil Co.*, 447 F.2d 997, 1004 (5th Cir. 1971). The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but "merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *United States v. Morrison*, 536 F.2d 286, 289 (9th Cir. 1976). The absence of benefit to GCC does not preclude liability. An action for conversion may be based on transferring possession of the owner's property to one not authorized to receive it. *Tractortechnic*

*Gebrueder v. Bousman*, 301 F.Supp. 153, 157 (E.D.Wis.1969). In particular, a bailee who transfers goods in a manner inconsistent with an owner's instructions is liable for conversion to his bailor. *Metropolitan Vacuum Cleaner Co. v. Douglas-Guardian W. Corp.*, 208 F.Supp. 195, 198 (S.D.N.Y.1962).

Here, GCC, acting as bailee of the motor graders, *David Crystal, Inc. v. Cunard S.S. Co.*, 339 F.2d 295, 298 (2d Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965), transshipped the motor graders in contravention of its agreement with Wabco to hold them in Piraeus. Under these circumstances, GCC is liable for conversion of Wabco's motor graders.

Since GCC's contract of carriage with Wabco was terminated by mutual consent, GCC can not rely on the limitation expressed in the bill of lading to shield it from liability. Upon assuming the status of bailee, GCC became liable for the full loss occasioned by its wrongful disposition of property. *David Crystal v. Cunard S.S. Co.*, *supra* at 298.

Plaintiff shall submit a judgment, on notice within ten days, consistent with this opinion.