In re CHATEAUGAY CORPORATION, Reomar, Inc., the L.T.V. Corporation, et al., Debtor.

In re LTV STEEL COMPANY, INC., Debtor.

In re LTV STEEL TUBULAR PRODUCTS COMPANY, Debtor.

Nos. 86 B 11270 (BRL) to 86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11274 (BRL).

United States Bankruptcy Court, S.D. New York.

Jan. 16, 1992.

Davis Polk & Wardwell by Guy Miller Struve, David J. Murray, Kaye, Scholer, Fierman, Hays & Handler, New York City by Steven Fox, for debtor.

Shea & Gould by Glenn E. Siegel, Friedman, Wang & Bleiberg, P.C., New York City by Arthur S. Friedman, Charles M. Bleiberg, Susan J. Schwartz, for Frito–Lay, Inc.

BURTON R. LIFLAND, Chief Judge.

## I. INTRODUCTION

This is the second motion for summary judgment brought by LTV Corporation and its affiliates (collectively, "LTV" or the "Debtor") against Frito–Lay, Inc. ("Frito–Lay"). It is related to a prior motion for partial summary judgment heard and decided by this Court, involving essentially the same issues and subject matter. All issues save one were addressed previously in this Court's opinion and the District Court's decision on appeal. The only remaining issue is that of the viability of Frito–Lay's non-indemnity tort claims against LTV under certain tax benefit transfer ("TBT") agreements (the "TBT Agreements") between the parties.

## II. BACKGROUND

For a full statement of the facts and circumstances of this contested matter, see this Court's earlier decision in *In re Chateaugay Corp.*, 102 B.R. 335 (Bankr. S.D.N.Y.1989), *aff'd*, No. 89 Civ. 6687 (S.D.N.Y. Mar. 29, 1990) (affirmed for reasons stated in Record of March 23, 1990). Familiarity with the facts is assumed, and only those facts that bear upon this decision will be repeated or summarized here.

This controversy arises from the post-petition reacquisition of certain assets and related tax benefits by LTV from Frito–Lay. Those assets and tax benefits had been transferred pre-petition by LTV to Frito–Lay in accordance with former Section 168(f)(8) of Title 26 of the United States Internal Revenue Code (the "IRC"), pursuant to twenty-five safe harbor leases or TBT Agreements. Under the TBT Agreements, LTV agreed to transfer to Frito–Lay the tax benefits which it received for certain of its assets (the "TBT Assets"). In 1987, LTV retired some TBT Assets, resulting in a tax gain for LTV and a loss of tax transfer benefits to Frito–Lay. In response, Frito–Lay has filed numerous proofs of claim with this Court (the "Frito–Lay Claims") seeking, or reserving a right

to seek, an administrative priority against LTV's estate.

By amended motion dated March 20, 1989, the Debtors lodged their objection (the "Objection") to the Frito–Lay Claims. Pursuant to the Objection, the Debtors sought a legal determination that (a) the TBT Agreements do not constitute executory contracts or unexpired leases under § 365 of the United States Bankruptcy Code (the "Code"), and (b) the Frito–Lay Claims are pre-petition general unsecured claims which are not entitled to priority treatment under §§ 503 and 507 of the Code. In response, Frito–Lay filed a cross-motion on April 25, 1989, seeking a determination that its claims are entitled to administrative priority treatment under various contract, quasi-contract and tort theories of recovery.

In connection with the Objection, the Debtors simultaneously moved for partial summary judgment with respect to the TBT Agreements and their indemnity claims thereunder (the "Indemnity Loss Claims") relating to LTV Steel's Buffalo, New York facilities (the "Buffalo Works").[1] On June 29, 1989, this Court granted the Debtor's partial summary judgment motion, holding that the TBT Agreements do not constitute executory contracts or unexpired leases under § 365 of the Code, and that the Indemnity Loss Claims are pre-petition general unsecured claims which are not entitled to priority treatment under §§ 503 and 507 of the Code. *In re Chateaugay*, 102 B.R. at 350–56. At that time, this Court made no findings as to Frito–Lay's non-indemnity claims of tortious conduct.[2]

On appeal, the District Court affirmed this Court's grant of partial summary judgment. *In re Chateaugay*, No. 89 Civ. 6687 (S.D.N.Y. Mar. 29, 1990). In affirming, the

Court determined, *inter alia,* that regardless of whether the TBT Agreements constitute executory contracts or unexpired leases, Frito–Lay is not entitled to an administrative priority claim because it conferred no post-petition benefit on the Debtor.

District Court Record of March 23, 1990 at 24–25. In reaching that determination, the District Court distinguished between LTV taking the tax benefit itself, and Frito–Lay giving it to LTV. The District Court rejected the other theories of recovery asserted in Frito–Lay's cross-motion as grounds for administrative priority treatment, and affirmed this Court's decision.[3]

Subsequent to the District Court's affirmance, the Debtors filed the instant Motion for Summary Judgment which essentially seeks a determination (1) that the prior TBT holding involving the Buffalo Works applies to other facilities as well, and (2) with regard to those undecided non-indemnity claims, that they are defective and not entitled to administrative priority. Frito–Lay filed a cross-motion for partial summary judgment of its non-indemnity claims on July 20, 1990. In its papers it raised all its prior claims with regard to the retirement of the Buffalo Works and added those claims with regard to LTV Steel's Aliquippa, Pennsylvania facilities (the "Aliquippa Works").

### III. SUMMARY JUDGMENT

■ Pursuant to Federal Rule of Civil Procedure 56(c), as made applicable herein pursuant to Bankruptcy Rule 7056, summary judgment is appropriate when there is no material fact in dispute and the court may decide the issues as a matter of law. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 444 (2d Cir.1980). The

---

**1.** Although the TBT Agreements involved a number of facilities, the prior Motion was confined to the Buffalo Works.

**2.** This Court held as follows:
> It should be noted that this Court's finding is limited to Debtors' indemnity obligations which arise under the Frito–Lay TBT Agreements. Such a finding does not preclude Frito–Lay from pursuing its allegations of tor-

tious conduct on the part of the Debtors as debtor-in-possession, which allegations the Debtors vigorously deny, and which are the subject of another branch of this litigation. *In re Chateaugay,* 102 B.R. at 356.

**3.** The District Court issued an Order, dated March 29, 1990, affirming this Court's decision, based on determinations set forth in its Record of March 23, 1990.

court's role in ruling on a motion for summary judgment is to determine whether there exists a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the movant demonstrates the lack of any genuine issue of material fact, summary judgment is appropriate. *In re O.P.M. Leasing Services, Inc.,* 46 B.R. 661, 665 (Bankr.S.D.N.Y. 1985). However, the court must deny summary judgment where disputes exist over facts that might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Summary judgment has frequently been issued where a court has been requested to interpret the terms of a contract. *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir. 1980); *Parish v. Howard,* 459 F.2d 616, 618 (8th Cir.1972); *Freeman v. Continental Gin Co.,* 381 F.2d 459, 465 (5th Cir.1967); *Nat'l Util. Serv., Inc. v. Whirlpool Corp.,* 325 F.2d 779, 781 (2d Cir.1963); *In re Tikijian,* 76 B.R. 304, 313 (Bankr.S.D.N.Y. 1987).

■ Cases with a complex factual record may be appropriately disposed of on summary judgment; the complexity of factual issues alone cannot justify denial of summary judgment. *See, Apex Oil Co. v. Di-Mauro,* 641 F.Supp. 1246, 1255–57 (S.D.N.Y.1986), *aff'd in part, rev'd in part on other grounds,* 822 F.2d 246 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987). Both the Supreme Court and the Second Circuit have "encouraged the use of summary judgment in complex cases to avoid unnecessary trials." *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1011–12 (2d Cir.1989). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555 (citing Fed.

R.Civ.P. 1); *accord, Knight v. United States Fire Insur. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

As per the discussion below, based upon all of the pleadings, the affidavits and the exhibits submitted, there are no genuine issues of material fact which would preclude the granting of summary judgment in the instant case.

## IV. DOCTRINE OF THE LAW OF THE CASE

■ LTV asserts that the TBT Agreements, and in particular those which refer to the Buffalo Works and the Aliquippa Works, are not executory contracts nor unexpired leases. Frito–Lay argues that, although this Court has made findings with regard to those TBT Agreements relating to the Buffalo Works, this Court's prior opinion does not refer to any other TBT Agreement. LTV counters that the Court's opinion was based on two representative TBT Agreements which it considered to be typical of all the TBT Agreements.

■ Under the doctrine of the law of the case, "[w]hen an appellate court has once decided an issue, the trial court, at a later stage in the litigation, is under a duty to follow the appellate court's ruling on that issue." *Doe v. New York City Dep't of Social Services,* 709 F.2d 782, 788 (2d Cir. 1983) (citing *United States v. Cirami,* 563 F.2d 26, 32 (2d Cir.1977)), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *see also, In re PCH Associates,* 949 F.2d 585, 592 (2d Cir.1991) ("a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation.") The doctrine applies to all issues decided expressly or by necessary implication. *United States v. Yonkers Bd. of Educ.,* 856 F.2d 7, 11 (2d Cir.1988); *Fogel v. Chestnutt,* 668 F.2d 100, 108 (2d Cir. 1981), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); *Carrillo v. Heck-*

*ler,* 599 F.Supp. 1164, 1168 (S.D.N.Y.1984). However, this does not include issues which have specifically not been decided. *In re PCH,* 949 F.2d at 593 ("Application of the doctrine [of law of the case] does not preclude us from conclusively determining the issue we left unanswered....")

As discussed above, this Court has already determined that the TBT Agreements with regard to the Buffalo Works do not constitute executory contracts or unexpired leases under § 365 of the Code, and that the indemnity loss claims are pre-petition general unsecured claims which are not entitled to priority treatment under §§ 503 and 507 of the Code. *In re Chateaugay,* 102 B.R. at 350–56. This Court's determination was affirmed on appeal, and is now the controlling law of this case.[4]

■ While the instant motion involves those TBT Agreements relating to the Aliquippa Works as well as the Buffalo Works, this Court is not persuaded by Frito–Lay's argument that the District Court's opinion is not applicable to all the TBT Agreements. Although the doctrine of law of the case does not preclude further determinations of different or new issues, *In re PCH,* 949 F.2d 585, it does prevent re-litigation of the same issues. The issue before the court now concerns the same TBT Agreements that have already been ruled upon by this Court, as well as the District Court. The TBT Agreements are sufficiently uniform to allow the previous ruling to be expanded to apply to them all.[5] As this Court has stated in its prior holding,

> The TBT Agreement [with] Republic ... and the TBT Agreement [with] J & L Steel ... are alleged to be fairly repre-

**4.** However, Frito–Lay's tort claims were not addressed in our prior decision (*see, supra,* note 2) and thus are not subject to the law of the case doctrine, as outlined in *In re PCH,* 949 F.2d at 592.

**5.** In fact, the TBT Agreements which were analyzed by this Court for the purpose of ruling on the Buffalo Works were the J & L Agreement between J & L Steel and Ainwick Corp., dated

sentative, in structure and substance, of all the Frito–Lay TBT Agreements.... *In re Chateaugay,* 102 B.R. at 341.

Although Frito–Lay claims that LTV's request for extension of the previous holding to include those TBT Agreements governing the Aliquippa Works as well as the Buffalo Works is improper, they make no showing that the TBT Agreements are not universally similar. Absent such a showing, application of the doctrine of the law of the case is appropriate.

There is a more flexible branch of the law of the case doctrine which is applicable to successive determinations by the same court. However, even by those standards, summary judgment with respect to these issues would be warranted. *See generally,* 1B James W. Moore, et al., *Moore's Federal Practice* Para. 0.404 (2d ed. 1988). "The jurisprudential concerns underlying [the more flexible branch of the doctrine] counsel against reconsideration of issues absent compelling circumstances such as an intervening change of law, the availability of new evidence, the need to correct a clear error, or to prevent manifest injustice." *Diduck v. Kaszycki & Sons Contractors, Inc.,* 737 F.Supp. 792, 797 (S.D.N.Y.1990); *accord, United States v. Adegbite,* 877 F.2d 174, 178 (2d Cir.), *cert. denied,* 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989); *Yonkers v. Bd. of Educ.,* 856 F.2d 7, 11; *Doe,* 709 F.2d at 789; *Fogel,* 668 F.2d at 109; *Wilder v. Bernstein,* 645 F.Supp. 1292, 1310 (S.D.N.Y.1986), *aff'd,* 848 F.2d 1338 (2d Cir.1988). In this instance, there are no such compelling circumstances which might warrant a reconsideration of the same contractual agreements which have already been before this Court.

November 12, 1981 (the "J & L Agreement"), and the Republic Agreement between Republic and Frito–Lay, dated October 12, 1982 (the "Republic Agreement"). Both those Agreements were used as typical examples of all 25 TBT Agreements, and neither was specific to the Buffalo Works alone. The TBT Agreements, *in toto,* covered 18 separate LTV Steel production facilities, including the Buffalo Works and the Aliquippa Works.

## V. NON–INDEMNITY CLAIMS [6]

### A. Conversion

 Frito–Lay alleges that LTV's retirement of the TBT Assets constitutes a tort of conversion. The standard for establishing conversion was analyzed by Judge Brozman in *In re Sattler's, Inc.*, 73 B.R. 780, 791 (Bankr.S.D.N.Y.1987), as follows:

Conversion is defined as the wrongful or unlawful appropriation of personal property by one not entitled to possession. [citations omitted] Stated another way, conversion is the "unauthorized exercise of dominion or control over property by one who is not its owner which interferes with another person's superior possessory rights." *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 995 (S.D.N.Y.1984); *accord, Wabco Trade Company Division of World Standard Export, Ltd. v. S.S. Inger Skou*, 482 F.Supp. 444, 448 (S.D.N.Y.1979). "The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but 'merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another.' *United States v. Morrison*, 536 F.2d 286, 289 (9th Cir.1976)...."

*Accord, United States v. Paladin*, 539 F.Supp. 100, 103 (W.D.N.Y.1982); *See also, United States v. Stockton*, 788 F.2d 210, 216 (4th Cir.), *cert. denied*, 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89 (1986). Consistent with this standard for conversion, courts have established a two-part test. First, the moving party must establish legal ownership or an immediate superior right of possession in the property at issue. Second, the moving party must show that unauthorized dominion was exercised over that property, to the exclusion of the moving party's rights. *In re Weiss–Wolf, Inc.*, 60 B.R. 969, 982 (Bankr.S.D.N.Y.1986). A cause of action for conversion cannot be supported without first establishing a

rightful ownership to property. *Weingarten v. Warren*, 753 F.Supp. 491, 497 (S.D.N.Y.1990).

Frito–Lay makes no claim as to ownership of the TBT Assets. Its only claim of ownership is its right to receive TBTs under the TBT Agreements. Thus, it argues that LTV's retirement of the two TBT Assets at issue was a conversion of its property right in the TBTs. It is undisputed by the parties that, to the extent that the right to receive a TBT is property, it is *intangible* property. While it is uncontroverted that Frito–Lay had a right to receive TBTs, it is doubtful whether such intangible property may be converted.

 At common law, the only property capable of being converted was any tangible chattel which could be lost and found. W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts*, § 15 at 90 n. 15 (5th ed. 1984) (citing *Graham v. Smith*, 100 Ga. 434, 28 S.E. 225 (1897)). *See also, United States v. May*, 625 F.2d 186, 190 (8th Cir.1980) (citing *Restatement (Second) of Torts* § 222A (1965)). It is still generally held that the only property which is capable of being converted is personal property which is either tangible, or is "represented by or connected with something tangible, and not for indefinite, intangible, and incorporeal species of property." Annotation, *Nature of property or rights other than tangible chattels which may be subject of conversion*, 44 A.L.R.2d 927, 929 (1991). However, modern tort law has extended this concept to include conversion of certain intangible property. *May*, 625 F.2d at 190; *Pearson v. Dodd*, 410 F.2d 701, 707 n. 34 (D.C.Cir.), *cert. denied*, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). In particular, a number of exceptions have evolved which fall into the general category of intangible rights which have been merged into documents which are valuable either commercially or to their owner. 44

---

**6.** Neither party has raised the issue of choice of law as to any of the non-indemnity claims, and this Court has not uncovered any substantial difference among the state laws of any of the possible jurisdictions in this case. We therefore apply the substantive law of this forum, in accordance with *Erie R.R. v. Tompkins* and its

progeny. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Lehman v. Dow Jones & Company, Inc.*, 783 F.2d 285 (2nd Cir. 1986); *In re Gulf Oil*, 725 F.Supp. 712 (S.D.N.Y. 1989); *Deep South Pepsi–Cola Bottling Co. v. Pepsico, Inc.*, No. 88 Civ. 6243, 1989 WL 48400, 1989 U.S.Dist. LEXIS 4639 (S.D.N.Y.1989).

A.L.R.2d at 929.[7] Thus, conversion as an action against loss of tangible property has been extended to include intangible rights which are closely associated with some form of tangible property. *See, Iglesias v. U.S.,* 848 F.2d 362, 364 (2d Cir.1988). However, this extension does not include one's purely intangible rights *not* also connected to one's tangible property. *See, Ippolito v. Lennon,* 150 A.D.2d 300, 542 N.Y.S.2d 3, 6 (1st Dep't 1989) (holding that no cause of action existed for conversion of musician's purely intangible property interest in a concert performance); *Sporn v. MCA Records, Inc.,* 58 N.Y.2d 482, 462 N.Y.S.2d 413, 416, 448 N.E.2d 1324, 1327 (1983) (holding that a separate claim for conversion involving purely intangible property cannot stand, even though the intangible property rights flow from a tangible master recording); *Matzan v. Eastman Kodak Co.,* 134 A.D.2d 863, 521 N.Y.S.2d 917, 918 (4th Dep't 1987) (holding that one cannot convert another's ideas, and thus a claim for conversion does not lie for the withholding of purely intangible property).

■ Frito–Lay is the rightful owner of the TBTs provided for in the TBT Agreements. These TBTs flow from the underlying TBT Assets, and are benefits which have been transferred to Frito–Lay by LTV, the owner of the TBT Assets. Although it may be the case that conversion of certain tangible property will result in conversion of the intangible property associated with it, that is not true here. Although TBTs are closely associated with the TBT Assets, they have been specifically disconnected from them and transferred to Frito–Lay as purely intangible rights. Indeed, by their very nature TBTs are intangible rights which have been severed from the underlying tangible property. Whatever benefit TBTs may have had as the subject of conversion in the hands of LTV has been lost by their transfer.[8]

Thus, the TBTs cannot be analogized appropriately to any form of intangible property which would allow an action for the tort of conversion to lie.

## B. *Unjust Enrichment*

Frito–Lay asserts that, because LTV gained tax benefits from the retirement of the TBT Assets, which retirement caused Frito–Lay to lose its TBT benefits under the TBT Agreements, "LTV was unjustly enriched at Frito–Lay's expense." Memorandum of Law of Frito–Lay at 32. This Court does not agree.

■ Unjust enrichment, a quasi-contract claim, occurs when there is an unjust retention of a benefit to the detriment of another, outside the protection of an actual contractual arrangement. In such a case, a duty to the losing party is implied, and restitution for such unjust retention is required on the grounds of fundamental fairness and equity. *See,* 66 Am.Jur.2d *Restitution and Implied Contracts* § 3 (1973). *See also, Caton v. Leach Corp.,* 896 F.2d 939, 947 (5th Cir.1990); *Clark–Fitzpatrick, Inc. v. L.I.R.R. Co.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). In the instant case, the retention by LTV of its original tax benefit is neither unjust, nor is it outside a contractual arrangement. It is undisputed that LTV retained all ownership rights to the TBT Assets, save those to the TBTs.[9] Therefore, LTV always re-

---

**7.** A non-exclusive list of intangible property for which actions of conversion have been allowed are: checks, bills of exchange, promissory notes, bonds, bills of lading, money, bankbooks, deeds, mortgages, manuscripts, contracts and insurance policies. Although stock certificates could be thought of in this category, they often occupy a category of their own as symbolic representations of tangible property.

**8.** Absent the concept of a merger with the TBT Assets, Frito–Lay could assert that the TBTs have merged with the TBT Agreements as documents representing their rights. However, there is no assertion that the TBT Agreements

themselves have been converted. The TBT Agreements are contracts between the parties which give rise to the TBTs as contractual rights. But no cause of action may lie for conversion of a contractual right. *See, Hutton v. Klabal Gallery, Inc.,* 726 F.Supp. 67, 72 (S.D.N.Y.1989) (citing *Peters Griffin Woodward, Inc. v. WCSC, Inc.,* 452 N.Y.S.2d 599, 600 (1st Dep't 1982)) (holding that actions for conversion are invalid if damages are due to breach of contract).

**9.** The TBT Agreements state, in pertinent part: Lessor [Frito–Lay] shall have no right, title or interest in any item of Equipment as a result

tained the right to retire its own Assets. In fact, such a retirement, which, among other things, would constitute a "disqualifying event" under 26 C.F.R. § 5c.168(f)(8) (1991) and thus would deprive Frito–Lay of its TBTs, was provided for under the TBT Agreements in the section covering indemnification.[10] Under the TBT Agreements, Frito–Lay protected the benefit of its bargain by providing that LTV would indemnify it against the loss of its TBTs if a disqualifying event occurred prior to a certain time. Thus, the possibility of retirement of the TBT Assets was known to Frito–Lay when it entered into the TBT Agreements, and provisions for it were part of the initial bargain. It is disingenuous for Frito–Lay to claim now that such retirement is somehow "unjust". Furthermore, it is unclear why a quasi-contract remedy is necessary when a clear contract remedy has already been provided by the parties themselves. Indeed, when a contract, by its express terms, provides for an event, there can be no recovery in quasi-contract for that same event. *Caton*, 896 F.2d at 947; *In re Penn Cent. Transp. Co.*, 831 F.2d 1221, 1229 (3rd Cir.1987); *L.I.R.R.*, 516 N.E.2d at 193, ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.").

Frito–Lay argues that, in a bankruptcy context, the usual stricture against quasi-contract claims in the face of a written contract need not apply. However, it offers no convincing authority that it should not apply here. Even a cursory examination of bankruptcy law reveals that unjust enrichment claims are barred when the parties are subject to an express agreement. *In re Auto Dealer Services, Inc.*, 110 B.R. 68, 70 (Bankr.M.D.Fla.1990); *In re Republic Fabricators, Inc.*, 104 B.R. 933, 947 (Bankr.N.D.Ind.1989). *See also, In re LCS Homes, Inc.*, 103 B.R. 736, 748 (Bankr. E.D.Va.1989) (upholding an unjust enrichment claim in the absence of an express contract). Thus, this Court sees no justification for upholding the claim of unjust enrichment.

## C. Breach of Fiduciary Duty

■ Frito–Lay alleges that LTV has breached its fiduciary duty under the Code by failing to seek court authorization for the post-petition retirement of the TBT Assets. Frito–Lay claims that the retirement of the Buffalo and Aliquippa Works was an unauthorized "abandonment" under § 554 of the Code, as well as an unauthorized "use" under § 363 of the Code. These claims are not supported by the Code.[10a]

The definition of "abandonment" under the Code is very specific.[11] It has been succinctly interpreted to mean the "release from the Debtor's estate of property previously included in that estate [citation omitted]." *Midlantic National Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 508, 106 S.Ct. 755, 763, 88 L.Ed.2d 859 (1986); *accord, In re Killebrew*, 888 F.2d 1516, 1520 (5th Cir.1989). This definition is not applicable to LTV's retirement of the TBT Assets. The TBT Assets were "withdrawn from productive use" within the meaning of 26 C.F.R. § 1.167(a)–8(a). However, this is not equiv-

---

of entering into this Agreement.... Lessee [LTV] shall retain all of the rights, benefits, incidents, burdens and obligations of ownership of each Item of Equipment, including without limitation, the right to sell, transfer, assign *or otherwise dispose of* any Item of Equipment.... (emphasis added) *In re Chateaugay*, 102 B.R. at 346–47 (citing Republic Agreement § 7.01).

**10.** Republic Agreement § 7.01 and J & L Agreement § 2.4.

**10a.** In addition to this theory, Frito–Lay maintains that it was defrauded as to the actual date of the "retirement" because the Buffalo and

Aliquippa Works were "abandoned" or demolished at a later point in time. Here, too, Frito–Lay is confused as to the meaning of these terms. As discussed below, "abandonment" and "retirement" are not synoymous, and there is no evidence that the facilities at issue were not "retired" at the date indicated.

**11.** Section 554(a) of the Code states,

After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

alent to "abandonment" under § 554 of the Code. There is no indication that the TBT Assets are no longer part of the Debtor's estate. Furthermore, the "withdrawal" from "use" as defined in 26 C.F.R. § 1.167(a)–8(a) cannot be equated to a "use" under § 363 of the Code.

Under § 363(b)(1) of the Code, the Debtor may "use, sell, or lease" property of the estate only after notice and a hearing *unless* such use is in the ordinary course of business. Use in the ordinary course is specifically exempted from such requirement in § 363(c)(1).[12] This exemption is calculated to ensure the relatively smooth operation of the day to day business of the Debtor. 3 Collier Bankruptcy Manual § 363.03 (1991). As this Court has held,

> The "ordinary course of business" standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate. Title 11 procedures are not meant to strait jacket a debtor.... *In re Johns Manville Corp.*, 60 B.R. 612, 617 (Bankr.S.D.N.Y.1986).

*See also, In re H & S Transportation Co., Inc.* 115 B.R. 592, 598–99 (M.D.Tenn.1990); *In re McLean Industries, Inc.*, 96 B.R. 440, 444 (Bankr.S.D.N.Y.1989). It is undisputed that retirement of the Buffalo and Aliquippa Works was a necessary and proper business decision for the Debtor, and Frito–Lay has offered no evidence to indicate that the retirement was out of the ordinary course of business for one of the world's largest steel manufacturers. The mere usage of the same term "use" in both 26 C.F.R. § 1.167 and § 363 of the Code does not lead this Court to conclude that the retirement at issue required Court approval.

Because the terms of both § 554 and § 363 of the Code are inapplicable to LTV's retirement of the TBT Assets, LTV was not required to seek court authorization, and thus acted within the scope of its powers as debtor in possession. We find no basis for Frito–Lay's claim of breach of fiduciary duty.

### D. Administrative Priority

Because there is no basis for Frito–Lay's non-indemnity claims, we need not address here the issue of administrative priority of these denied claims.

Accordingly, it is hereby found and determined that, for all the reasons set forth herein, LTV's motion for summary judgment is granted, and Frito–Lay's cross-motion for partial summary judgment is denied.

LTV SHALL SUBMIT AN ORDER in accordance with the foregoing.

---

**12.** Section 363(c)(1) of the Code states, in pertinent part:

> the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.