**In re Bracha KIZELNIK, aka/dba Bruchie, Debtor.**

**ULSTER SAVINGS BANK, Plaintiff,**

**v.**

**Bracha KIZELNIK, aka/dba Bruchie, Defendant.**

**Bankruptcy No. 94–B–21262 (ASH). Adv. No. 95–5100A.**

United States Bankruptcy Court, S.D. New York.

Dec. 14, 1995.

172

Howard C. St. John & Associates by Neil H. Ackerman, Kingston, NY, for plaintiff.

Law Office of Shmuel Klein, P.C. by Shmuel Klein, Spring Valley, NY, for defendant.

## DECISION RESOLVING MOTION FOR SUMMARY JUDGMENT AND ADVERSARY PROCEEDING

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

This case raises the question whether a tenant or optionee of mortgaged premises, who is otherwise a stranger to the mortgage indebtedness, can block foreclosure sale of the premises by filing a Chapter 13 petition, de-accelerating and reinstating the mortgage and paying the arrears in a Chapter 13 plan.

Defendant-debtor Bracha Kizelnik a/k/a d/b/a Bruchie ("Kizelnik") is the granddaughter of mortgagors Moses and Rivka Stein (the "Steins") and resides as a tenant in the Steins' house at 28 Dorsett Road, Spring Valley, New York (the "Stein House") which is mortgaged to plaintiff secured creditor Ulster Savings Bank ("USB"). Kizelnik filed the petition in this case on July 18, 1994, one day before the fourth foreclosure sale scheduled by USB, in order to stay foreclosure on the Stein House.

This adversary proceeding was commenced by USB for a determination that Kizelnik has no interest in the Stein House entitling her to the protection of the automatic stay under 11 U.S.C. § 362(a) and no right to de-accelerate and "cure" the Steins' long-defaulted mortgage loan.

### *Background*
#### *Prior Proceedings*

This Chapter 13 case, the adversary proceeding, the instant motion and the relief granted can best be understood with a brief summary of the events and litigation proceedings which preceded the filing of this case.

The Steins, by an attorney-in-fact, executed a note and a mortgage covering the Stein House dated December 22, 1987. The Steins defaulted in May 1992, and in April 1993 USB obtained a foreclosure judgment. USB scheduled its first foreclosure sale in May 1993. The Steins, at all times represented by Kizelnik's attorney in this case, filed a motion alleging improper service of process and obtained a stay pending a traverse hearing on September 13, 1993. When the Steins failed to appear at the September 13, 1993 hearing, the stay was lifted. A second foreclosure sale scheduled for November 15, 1993 was stayed when Moses Stein filed a Chapter 13 petition on the eve of sale. USB was granted relief from the stay on March 10, 1994 for Stein's failure to make any post-petition payments. A third foreclosure sale was scheduled for April 28, 1994. On March 28, 1994 Stein filed an application for a temporary restraining order, which was denied on March 30, 1994. But on April 6 at a hearing on another motion for injunctive relief filed by Stein, Judge Bernstein granted the stay in a conditional order. Unbeknownst to Judge Bernstein or USB, the Chapter 13 trustee had previously moved to dismiss Stein's case for failure to appear at a section 341 meeting or make payments to the trustee. The Chapter 13 trustee's motion to dismiss was granted by Judge Gallet on April 7. Moreover, Stein never complied with Judge Bernstein's conditional order dated April 6. The third foreclosure sale scheduled for April 28 was stayed by a second Chapter 13 petition filed on behalf of Moses Stein. On June 9, 1994, Judge Bernstein dismissed Stein's second Chapter 13 case with prejudice for bad faith and sanctioned his attorney in the amount of $3,500.

The fourth foreclosure sale was scheduled for July 19, 1994. Stein moved by order to show cause to stay the fourth foreclosure sale, apparently asserting his intention to appeal Judge Bernstein's June 9 order. Judge Connelly denied relief for lack of timely filing of a notice of appeal.

### Proceedings in this Case

With Judge Connelly's refusal to stay Judge Bernstein's June 9, 1994 dismissal with prejudice of the Stein bankruptcy, it appeared that USB would finally achieve its long-sought objective of foreclosure at the fourth sale scheduled for July 19, 1994. But once again USB was foiled in its efforts, this time by Kizelnik's petition in this case filed on July 18. Kizelnik's Chapter 13 plan dated July 15, 1994 listed a surplus of expenses over monthly take-home pay of only $153 but called for monthly plan payments of $440 for sixty months, with no explanation of the source of additional funds. The plan called for sixty monthly payments of $1,319 direct to USB, totalling $79,140, and fifty-nine monthly payments to USB through the plan trustee averaging $393, totalling $23,187 on account of purported "arrearage" of $21,000 at 4% [sic—figures taken from the plan]. The total amount of payments to USB called for under the plan, $102,327 ($23,187 plus $79,140), is substantially less than either USB's or the debtor's attorney's version of the amount of the Steins' indebtedness secured by the Stein House.[1]

USB moved by notice of motion dated August 10, 1994 for an order granting relief from the automatic stay under 11 U.S.C. § 362(d)(1). A hearing on the motion was held on August 24, 1994, and a conditional order purportedly on consent was signed by Judge Connelly on September 7, 1994 (the "September 7 Order").

In her Chapter 13 filing Kizelnik listed the indebtedness owing to USB as $120,000. USB eventually filed a proof of claim in the amount of $148,899. Kizelnik responded by filing an objection to USB's proof of claim, which came before the Court in March 1995. It was revealed during the argument that Kizelnik is not the mortgagor, does not own the Stein House and has no personal liability on the secured indebtedness. Finding it incomprehensible that the Court should be burdened with contentious and petty litigation over the calculation of mortgage indebtedness which this debtor has no legal obligation to pay, the Court did not rule on Kizelnik's objection and suggested that the parties resolve more fundamental issues affecting this case by appropriate procedures.

This adversary proceeding was commenced by summons and complaint dated May 25, 1995. The relief sought is a declaratory judgment that (1) the Stein House .is not property of Kizelnik's bankruptcy estate, (2) Kizelnik has no interest in the Stein House entitling her to the protections of the automatic stay provisions of 11 U.S.C. § 362(a) as against USB, (3) cause exists entitling USB to relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (4) Kizelnik is not entitled to de-accelerate and reinstate the mortgage and cure, by her Chapter 13 plan, the pre-petition arrearage of the Steins. Alternatively, USB seeks a determination that, if Kizelnik has the right to de-accelerate and reinstate the mortgage and cure the pre-petition defaults of the Steins, she is obligated to cure the entire contractual arrearage.

USB moved for summary judgment by notice dated October 20, 1995. The motion was fully briefed by both sides, and at a hearing on November 15, 1995 the Court heard over two hours of argument.

At the November 15 hearing counsel for both sides acknowledged that all discovery has been completed, at least for purposes of this motion. In moving for summary judgment, USB has asserted that there are no triable issues of fact (notwithstanding the lack of a meaningful statement in accordance with local Bankruptcy Rule 13(h)) and that it is entitled to judgment as a matter of law. In his opposing affirmation and memorandum the debtor's counsel argued at length that there are triable issues of fact. But at oral argument, when the Court required counsel to enumerate with particularity those issues of fact requiring a trial, counsel stated and unambiguously reaffirmed that Kizelnik does not now contend that. there are triable issues of fact. Lengthy oral argument failed to elucidate any material issues of fact requiring a trial with respect to the declaratory relief sought in the complaint.

1. Compare USB's Proof of Claim in this case and the Objection to Allowance of Claim dated January 12, 1995 filed by the debtor's attorney.

Thus, counsel for both sides have conceded in open court that this motion for summary judgment is ripe for determination.

### Contentions of the Parties

The greater part of the motion papers submitted by both sides is devoted to matters extraneous to the central issue in this case. That issue is the standing of Kizelnik to utilize the Bankruptcy Code to stay USB from pursuing its state law rights as secured creditor, de-accelerate and reinstate the Stein mortgage and cure the arrearage in a five-year Chapter 13 plan, despite the facts that she has no ownership interest in the Stein House, has no personal liability for the Stein note and mortgage and even denies that she must pay the full amount of the Steins' contractual arrears in the context of a Chapter 13 plan.

Stated (or more accurately, restated) concisely, USB's basic position is that a non-mortgagor such as Kizelnik has no right to intervene and de-accelerate another party's defaulted mortgage, for which she is not indebted, and no right to invoke the bankruptcy laws to stay a secured creditor's right to foreclose on its collateral, which the non-mortgagor does not own. USB relies upon *In re Kelly*, 67 B.R. 508 (Bankr.S.D.Miss. 1986); *In re Andrews*, 15 B.R. 717 (Bankr. D.S.C.1981); *In re Green*, 42 B.R. 308 (Bankr.D.N.H.1984); and *In re 680 Fifth Avenue Associates*, 29 F.3d 95 (2d Cir.1994).

In her attorney's affirmation, memorandum of law and oral argument, Kizelnik did not contest the basic legal proposition relied upon by USB. She made no effort to distinguish or even mention the cases relied on by USB. Nor did she present any authority or even argument in support of the proposition that she has standing merely as a tenant or option holder to stay USB in the exercise of its rights, or to de-accelerate and cure the

mortgage default by means of a Chapter 13 plan.

Kizelnik's defense to USB's central contention is based on the September 7 Order. Again restated concisely, Kizelnik argues that the entire question of her standing was fully litigated in USB's motion to lift the stay which was argued on August 24, 1994 and which, she asserts, was "settled" by agreement of counsel embodied in the September 7 Order. Kizelnik argues that the September 7 Order constitutes an absolute bar to the adversary proceeding under the doctrines of law of the case, waiver and estoppel. She even argues that the September 7 Order limits the payments she needs to make to those set forth in her July 15 Plan, despite the fact that those payments do not equate to the Steins' contractual mortgage indebtedness, or even the far lower indebtedness recited in Kizelnik's own Plan.[2]

### Issues

As thus framed by the contentions of the parties presented in their motion papers and refined in the two-hour oral argument on November 15, two legal issues are presented on this motion:

(1) Using the rubric "standing" to encapsulate the substance of USB's position, does Kizelnik have standing to intervene and de-accelerate the Steins' defaulted mortgage loan or invoke the automatic stay of the Bankruptcy Code to forestall USB's right to foreclose on the Stein House?

(2) Is USB barred from seeking relief based on Kizelnik's lack of standing by reason of the September 7 Order on the grounds of law of the case, waiver or estoppel?

### Discussion
#### The Issue of Standing

■ USB's position on the question of standing is well-supported by common sense,

---

**2.** *See*, for example, Klein affirmation dated November 8, 1995 at paragraphs 6, 7, 8, 21, 23 ("Bracha Kizelnik never signed the mortgage contract which was the basis for the Plaintiff's foreclosure action against the Steins and is therefore not responsible for placing the Plaintiff in a pre-default condition"), 25, 26, 28, 29 ("There are no writings obligating this debtor to pay the

Plaintiff anything. The debtor did not sign the note or the mortgage"); memorandum of law dated November 8, 1995 at pages 3, 5–6, 10 ("this debtor is not legally obligated to pay anything more than the principal amount of the mortgage, and arguendo at most, the amount of the judgment").

established commercial practice, pertinent contractual provisions and the relevant legal authorities.

A prospective lender is understandably and properly concerned with the creditworthiness, reliability and integrity of its prospective borrower. A lender has the right to lend only to persons it believes will honor all obligations under the loan documents. A lender has a right to refuse credit to a borrower who is believed to be litigious or unworthy of credit. The Steins' loan documents with USB reflect these legitimate considerations. For example, the Steins' Note states that any person who takes over the Note obligations is obligated to keep all of the promises made in the Note (¶ 8). Even without a default in payment, the Note provides that the lender may demand immediate payment of all sums including principal secured by the collateral if all or any part of the collateral is sold or transferred, or if a beneficial interest in the borrower (if other than an individual person) is transferred without the lender's consent (¶ 10). And, of course, in the event of default the lender may require immediate payment in full of all unpaid principal and interest (¶ 6). Similar provisions, including the right to accelerate, are contained in the Steins' mortgage (¶¶ 11, 17, 19).

The position asserted by Kizelnik in this case is radical as a commercial matter. The loan documents here involved, which give the lender the right to accelerate the entire indebtedness if there is a default, or if the collateral is transferred, or if the borrower changes, are quite typical, and state law will enforce the lender's right to foreclose if the indebtedness is not then paid in full. Millions of dollars are loaned and borrowed every day in the confident expectation that the courts will respect these entirely traditional and long-recognized rights, obligations and remedies. Contrast this commercial reality with Kizelnik's postulate in this case: having received no payments from its mortgagors for 3½ years and having been frustrated in its attempts to resort to its collateral despite several years of court rulings purportedly vindicating its right to foreclose, USB is to be told now that it may not foreclose on its collateral so long as a stranger to the mortgage, who accepts no personal liability for the indebtedness, chooses to continue to make payments which concededly do not cover the secured indebtedness. Even if Kizelnik were prepared to assume legal responsibility to pay the Steins' mortgage and arrears in full, this Court is aware of no case which holds that a lender (USB) must extend credit to a proposed obligor (Kizelnik) deemed by the lender to be risky, litigious or otherwise unworthy of credit. Yet it is Kizelnik's position that USB must continue to extend its credit to the Steins (by indefinitely deferring its right to foreclose on its collateral) in exchange for her continued voluntary payments on the Steins' indebtedness which she may choose to terminate at any time. It is not surprising that Kizelnik cites no authority in support of such a commercially novel proposition.

Nor is there support for Kizelnik's position on the question of standing as a matter of bankruptcy law. The decisions cited by USB and other cases are squarely on point. For example, in *In re Green,* 42 B.R. 308 (Bankr. D.N.H.1984), John Dammann acquired property with a mortgage from Arlington Trust Company containing a typical "due on sale" clause, similar to that in the Steins' mortgage. Nevertheless, Dammann sold the property to Stephen and Christine Green, but did not record the transfer. After Dammann died the Greens recorded their deed, defaulted and filed a Chapter 13 petition, asserting that the automatic stay applied and that they should be allowed to cure their prepetition default in their Chapter 13 plan. The bankruptcy court rejected their position, stating (42 B.R. at 309):

> The court accordingly concludes that the actual Chapter 13 debtors in this proceeding, the Greens, as a strict matter of law cannot cure in their Chapter 13 plan the acceleration of the mortgage debt in question as between Arlington and Dammann. Arlington therefore has a right to either immediate payment in full of its mortgage debt, or a right to proceed to foreclose the same free of any restriction by these Chapter 13 proceedings.

The same result was reached in *In re Kelly*, 67 B.R. 508 (Bankr.S.D.Miss.1986). Archie Kelly purchased real property and gave a mortgage to the predecessor in interest of Jim Walter Homes. Archie defaulted and Jim Walter Homes commenced foreclosure proceedings. Archie then executed a quitclaim deed to his sister, Hazel Jean Kelly, who filed a petition under Chapter 13. Hazel Jean Kelly argued that she was the real purchaser and that Archie had taken title merely as an accommodation to her because it was claimed that the original lender would not finance her, as a single woman. She further argued that Archie had never lived in the property nor made any of the payments on the note, and that Jim Walter Homes had knowledge of these facts and accepted her monthly payments for seven years. Thus, Hazel Jean Kelly sought to cure Archie's default by means of her Chapter 13 plan. Since there was no debtor-creditor relationship between Hazel Jean and Jim Walter Homes, the bankruptcy court rejected her contentions and permitted Jim Walter Homes to continue its foreclosure proceedings, stating "the whole Chapter [13] presupposes a debtor-creditor relationship." 67 B.R. at 513. To the same effect see, *In re James R. Andrews, Jr.*, 15 B.R. 717, 719 (Bankr.D.S.C.1981) (Chapter 13 plan rejected where "[t]he effect of the plan is that the mortgagee must allow a person other than the debtor to cure the default; it forces the mortgagee to accept an assignment, and to receive payments, from a person other than the original mortgagor—a third person whose credit had not been relied on by the mortgagee and whose future earnings are not subject to the trustee's supervision and control"); *In re Wright*, 183 B.R. 541, 543 (Bankr.C.D.Ill.1995) (where no debtor-creditor relationship existed between the Chapter 12 debtor and the mortgagee concerning loans made before the original mortgagors deeded the real property to the Chapter 12 debtor, the court said "as there is no agreement, the Debtor can't cure a default which is not his, on loans which are not his, nor can he modify the terms of the loans to which he is not bound"); *In re Mitchell*, 184 B.R. 757, 759 (Bankr.C.D.Ill. 1994) (in granting mortgagee-bank's motion to lift the automatic stay in order to foreclose on property mortgaged by third party but owned and occupied by Chapter 13 debtor, the bankruptcy court found no "compelling equitable considerations which would mandate the imposition of a debtor-creditor relationship" on the debtor and mortgagee-bank); *In re Wilkinson*, 99 B.R. 366, 368–69 (Bankr.N.D.Ohio 1989) (bankruptcy court determined that the debtors could not cure the arrearage on the mortgage through their Chapter 13 plan because the debtors were not personally liable on the underlying mortgage taken out by the parent); *In re Jones*, 98 B.R. 757, 758 (Bankr.N.D.Ohio 1989) (internal citations omitted) ("Because Debtor is not liable on the mortgage, there exists no debt owing to the Bank; the Bank has no claim against Debtor; and there exists no creditor-debtor relationship. Because there is no Debtor-creditor relationship, Debtor's Plan may not provide for the curing of a default"). Similarly, in *In re Taylor*, 96 B.R. 584 (Bankr.E.D.Pa.1989), the bankruptcy court was confronted with a grantee-debtor asserting ownership rights in the context of a § 506(a) proceeding whereby the debtor sought to reduce the secured portion of the mortgagee's claim. The court, pointing out that the debtor had no direct contractual relationship with the secured creditor, stated: "We doubt whether a unilateral transaction between a grantor-mortgagor and a grantee-debtor can bind the mortgagee to accept the grantee-debtor as mortgagor. If this were the case, frustrated mortgage applicants could simply employ straw parties to obtain realty loans for them and, by the medium of post-mortgage conveyances, compel mortgagees to accept such rejected applicants as their mortgagors." 96 B.R. at 590–91. *Cf. In re Everhart*, 87 B.R. 35, 37 (Bankr.N.D.Ohio 1988) ("Generally, without an attendant liability on a mortgage note, there can be no cure of a default by a third party who has unilaterally made payments thereon without an assumption of the debt"; however, under the unique factual circumstances presented equity required that the debtor be allowed to cure the defaults on the mortgage note under her Chapter 13 plan even though she lacked privity on the mortgage).

In short, the Bankruptcy Code is intended to provide relief for debtors. The **"true"** debtors here are the Steins, and they have exhausted their rights in this Court and in the state courts. Kizelnik is not a debtor with respect to the Stein indebtedness. She does not need the protection of the Bankruptcy Code with respect to her own de minimus debts. Nothing in logic or the law supports Kizelnik's attempt to use the Code, in defiance of contractual rights, to augment the long-exhausted bankruptcy rights of the Steins, to the inevitable and self-evident further prejudice of USB.

The facts that Kizelnik is a tenant and has an option to purchase the Stein House do not confer standing on her, either as a matter of contract law or under the Bankruptcy Code. Indeed, even if Kizelnik had exercised her *purported* option and taken title to the Stein House, the express provisions of the note and mortgage and state law would give USB the right to immediate payment in full of the entire mortgage indebtedness, and the bankruptcy cases cited above would deny her standing to invoke the automatic stay to bar USB's state law right to foreclose. Kizelnik does not argue or cite authority to the contrary.

Surprisingly, neither party has brought to the Court's attention a line of cases which merit analysis with respect to the issues here. In *Johnson v. Home State Bank*, 501 U.S. 78, 80, 111 S.Ct. 2150, 2152, 115 L.Ed.2d 66, 72 (1991), the Supreme Court was faced with the issue of "whether a debtor can include a mortgage lien in a Chapter 13 bankruptcy reorganization plan once the personal obligation secured by the mortgaged property has been discharged in a Chapter 7 proceeding." Curtis Reed Johnson gave a mortgage to secure promissory notes to Home State Bank (the "Bank"). When Johnson defaulted on these notes, the Bank commenced foreclosure proceedings in state court. Thereafter Johnson filed a Chapter 7 petition in which the Bank moved for and was granted relief from the automatic stay. After reinitiating state court foreclosure proceedings, the Bank was awarded an in rem judgment and proceeded to schedule a foreclosure sale. Before the scheduled date of sale, Johnson filed a petition under Chapter 13 of the Bankruptcy Code and listed the Bank's mortgage as a claim against his estate. In holding that the mortgage lien remains a claim in the subsequent Chapter 13 case, the Court employed a statutory construction analysis. By applying the Court's previous conclusion in *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) that " ' "right to payment" [means] nothing more nor less than an enforceable obligation....,'" and Congress' intention "to adopt the broadest available definition of 'claim,'" *Johnson*, 501 U.S. at 83, 111 S.Ct. at 2154, 115 L.Ed.2d at 74 (citing *Davenport*, 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990); *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985)), the Court concluded that "a mortgage interest that survives the discharge of a debtor's personal liability is a 'claim' within the meaning of 101(5)." *Johnson*, 501 U.S. at 84, 111 S.Ct. at 2154, 115 L.Ed.2d at 75. After pointing out that the discharge extinguished only the in personam action against the debtor but not the in rem action, the Court noted that "§ 502(b)(1) contemplates circumstances ... which ... may consist of nothing more than an obligation enforceable against the debtor's property" and that "§ 102(2) establishes, as a '[r]ul[e] of construction,' that the phrase ' "claim against the debtor" includes claim against property of the debtor.'" *Johnson*, 501 U.S. at 85, 111 S.Ct. at 2155, 115 L.Ed.2d at 75. Thus the Court concluded that the mortgage that survived the Chapter 7 discharge of the debtor's personal liability could be treated in the same debtor's subsequent Chapter 13 plan.

While *Johnson* clearly does not dictate a different result here, cases that claim to follow *Johnson* impermissibly extend its holding beyond the same-debtor situation to Chapter 13 cases involving a transfer of property from a mortgagor-parent to a debtor-child. In *Matter of Hutcherson*, 186 B.R. 546 (Bankr.N.D.Ga.1995), the bankruptcy court, relying primarily upon *Johnson*, held that by virtue of a devise of an interest in the subject property from the mortgagor-mother to the debtor-daughter a mortgagee does "hold a 'claim' against the Debtor[-daugh-

ter]'s estate in bankruptcy, even though no 'privity of contract' ever existed between it and the Debtor[-daughter]." *Id.* at 551. By referring to the Supreme Court's statement that "we understand that Congress' intent to be that § 102(2) extend[s] to all interests having the relevant attributes of nonrecourse obligations *regardless of how these interests come into existence*" (emphasis in original), *Hutcherson,* 186 B.R. at 550 (citing *Johnson,* 501 U.S. at 86–87, 111 S.Ct. at 2155–56), the bankruptcy court rejected the mortgagee's argument that *Johnson* should be limited to its unique facts involving a single mortgagor who files a Chapter 13 case subsequent to receiving a discharge in a Chapter 7 case. The bankruptcy court disregarded the reasoning of the *Kelly, Jones* and *Wilkinson* cases "to the extent that those cases contradict the reasoning of *Johnson.*" *Hutcherson,* 186 B.R. at 550.

Similarly, in *Matter of Lumpkin,* 144 B.R. 240 (Bankr.D.Conn.1992), the bankruptcy court held that the *Johnson* ruling "that a mortgagee's right to payment in the form of a right to proceeds from sale of property and a right to foreclose are sufficient to constitute a 'claim' ", *Lumpkin,* 144 B.R. at 242, extends to a situation "involving a property transfer from [mother-mortgagor to daughter-debtor] where an existing mortgage has not been assumed." *Id.* A more appropriate basis for decision, relied upon in *Lumpkin* but not in *Hutcherson,* is a federal statute providing that a mortgage lender may not enforce its rights under a due-on-sale clause when the transferee is a child or spouse of the borrower. Garn–St. Germain Depository Institution Act of 1982 § 341(d)(6), 12 U.S.C.A. § 1701j–3(d)(6).

This Court believes that *Johnson* should be limited to its peculiar facts and should therefore only govern the resolution of "Chapter 20" cases involving a single mortgagor whose Chapter 13 bankruptcy is preceded by one under Chapter 7. The anomalous results in both *Hutcherson* and *Lumpkin* offend traditional commercial and contract law precepts, based upon a misinterpretation and misapplication of the Supreme Court's holding in *Johnson,* and this Court declines to recognize them as guiding precedent.

But even *Hutcherson* and *Lumpkin* do not mandate that any stranger may file a Chapter 13 petition, voluntarily begin payments upon another individual's defaulted mortgage and subject the mortgage to modification under the Chapter 13 plan. *See In re Threats,* 159 B.R. 241, 243–44 (Bankr.N.D.Ill.1993) (post-*Johnson* debtors who had obtained residential property by a quitclaim deed transferred from the original mortgagors without adhering to a due-on-sale clause were not permitted to cure defaults through a Chapter 13 plan). Kizelnik is not the original obligor whose personal obligation was discharged as in *Johnson,* nor is she the child to whom property was transferred by devise or quitclaim deed as in *Hutcherson* and *Lumpkin,* respectively. Kizelnik is the granddaughter of the original obligors and possesses, at most, an option to purchase. No case law has been found which would support standing based upon this extended relationship. Accordingly, I conclude that *Johnson* and its purported progeny do not extend to the relationship at hand.

It follows from the foregoing that Kizelnik does not have standing in this Chapter 13 case to block the rights of USB as a secured creditor. There is nothing in common sense, the contract documents or commercial law to support the proposition that the rights and remedies of a secured creditor can be blocked by the voluntary intervention of a new obligor who assumes the defaulting mortgagors' indebtedness, much less one who undertakes no liability whatever for that indebtedness or any deficiency.

***The September 7 Order***

█ It is evident from the foregoing that if USB had presented the standing argument and supporting cases when it made its motion to lift the stay in August 1994, the Court would have had no alternative but to grant the motion. But it did not do so. What actually happened was that counsel for the parties conferred and agreed upon a conditional order, which was signed by the Court on September 7.

Kizelnik now argues that the September 7 Order is preclusive, on three grounds: law of the case, estoppel and waiver. Kizelnik argues that the standing question was fully

**180**

argued at the hearing on August 24, 1994, and that the parties "settled" their dispute then and there by means of the September 7 Order, which bars a lift stay motion on any ground other than breach of the September 7 Order itself.

At the outset it should be noted that Kizelnik has not assisted the Court with the citation of a single legal authority in support of her defenses of waiver, estoppel and law of the case. USB has provided almost no authority on these issues. Before turning to the facts, it will be useful to set forth concisely the elements of each of these legal/equitable defenses.

■■■■ A waiver, according to the generally accepted definition, is the voluntary and intentional relinquishment or abandonment of a known existing legal right, advantage, benefit, claim or privilege, which except for such waiver the party would have enjoyed. 92 C.J.S. *Waiver* (1955). The essential elements of the equitable doctrine of waiver are an existing right, benefit, or advantage; knowledge, actual or constructive, of the existence of such right, benefit or advantage; and an actual intention to relinquish it or an adequate substitute for such intention. 31 C.J.S. *Estoppel* § 67 (1964). *See also, Dade Cty. v. Rohr Ind.,* 826 F.2d 983, 990 (11th Cir.1987). Waiver is a voluntary act which "implies election by a person to dispense with something of value or to forego some right or advantage which he might at his option have demanded and insisted upon"; it presupposes full awareness of an existing right or privilege and something done designedly or knowingly to relinquish it. 28 Am.Jur.2d *Estoppel & Waiver* §§ 154, 158 (1966). A waiver functions to preclude a subsequent assertion of the right waived or any claim based thereon. *Shapiro v. Leslie Fay Corp.,* 138 N.Y.S.2d 606 (Sup.Ct., Kings Cty., Dec. 20, 1954).

■■■■ Succinctly, estoppel is a principle designed to protect the justifiable reliances and expectations of innocent parties by barring another party from denying or alleging certain facts because of that party's previous conduct, allegation or denial. "It is said that three things must occur to constitute an estoppel in pais: (1) an admission, statement or act inconsistent with the claim afterward asserted; (2) action by the other party on the faith of such admission, statement or act; and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement or act." 28 Am.Jur.2d *Estoppel & Waiver* § 35 n. 11 (1966). A creature of equity, estoppel is based upon the grounds of public policy, fair dealing, good faith, and justice and its application must depend upon the facts and circumstances peculiar to each case. 28 Am. Jur.2d *Estoppel & Waiver* § 28 (1966).

■■■■ The doctrine of law of the case holds that a "decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re Chateaugay Corp.,* 136 B.R. 79, 83 (Bankr. S.D.N.Y.1992). The doctrine applies to all issues decided expressly or by necessary implication. *Id.* (citing *United States v. Yonkers Bd. of Educ.,* 856 F.2d 7, 11 (2d Cir.1988); *Fogel v. Chestnutt,* 668 F.2d 100, 108 (2d Cir.1981), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982); *Carrillo v. Heckler,* 599 F.Supp. 1164, 1168 (S.D.N.Y. 1984)). The doctrine was clearly expounded in *In re PCH Associates,* 949 F.2d 585, 592 (2d Cir.1991):

Under the law of the case doctrine, a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation. 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 0.404[1], at 117 (1991) (hereinafter *"Moore's Federal Practice"*). "[T]he doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) (dictum)). This doctrine is a discretionary rule of practice and generally does not limit a court's power to reconsider an issue. 1B *Moore's Federal Practice* ¶ 0.404[1], at 120 ("[L]aw of the case is ... a rule of practice and not a

limit on authority."). While the doctrine is ordinarily applied in later stages of the same lawsuit, it also has application to different lawsuits between the same parties. *See Schupak v. Califano*, 454 F.Supp. 105, 114 n. 17 (E.D.N.Y.1978) (recognizing that courts usually apply law of the case doctrine to bar relitigation of issues decided in earlier proceedings of the same lawsuit, employing it in later stages of the same lawsuit). The doctrine has been summarized as follows:

> Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. These rules do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment.

18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478, at 788 (1981); *accord, DiLaura v. Power Authority of State of New York*, 982 F.2d 73, 76 (2d Cir.1992); *In re Grossinger's Associates*, 184 B.R. 429, 434 (Bankr.S.D.N.Y. 1995).

Turning to the facts, it should be noted that neither side has submitted an affidavit of counsel explaining what happened at the August 24, 1994 hearing, or the reasons for the September 7 Order, or annexing copies of the parties' moving papers, or the transcript of the August 24 argument. At the November 15 hearing counsel for USB simply asserted that the conditional order was "to maintain the status quo", and Kizelnik's attorney asserted the three defenses in conclusory terms and urged the Court to examine the transcript of the August 24 hearing.

The Court has examined USB's August 1994 motion papers, Kizelnik's reply, the transcript of the August 24 hearing and the September 7 Order. These documents do not substantiate the elements of any of Kizelnik's affirmative defenses. They show that the standing issue raised in the adversary proceeding and on this motion for summary judgment was in no sense litigated or resolved in the August 1994 motion or the September 7 Order.

USB's notice of motion dated August 10, 1994 sought relief from the automatic stay "for cause on the grounds of lack of adequate protection pursuant to 11 U.S.C. § 362(d)(1)." The motion papers on both sides were bare bones, at best. Counsel's 4½ page affirmation in support of the motion recounted sparingly the history of USB's state and federal court litigation with the Steins, asserted that USB had received no mortgage payments since May of 1992 and was not adequately protected and concluded that Kizelnik had "no equity interest [in the Stein House] which gives to her a superior lien position over the first mortgage interest of USB." USB also submitted a 1½ page memorandum, citing 11 U.S.C. § 362(d)(1) but no cases, and concluding:

> Further, the debtor is *not* the owner of the subject property, and any rights she may have occurred subsequent to the recording of USB's first mortgage and commencement of its foreclosure action against Moses and Rivka Stein. Such cannot be the basis to stay the State Court foreclosure action.

The opposing motion papers consisted of a 1½ page affirmation by Kizelnik and a 1½ page affirmation by her attorney. Both affirmations simply asserted that Kizelnik had, in fact, made her post-petition payments, and they annexed copies of postal money orders evidencing such payments.

The matter of standing was not mentioned at all in USB's or Kizelnik's motion papers. Kizelnik's lack of an "equity interest" was asserted by USB to show that Kizelnik did not have a superior lien.

The transcript of the oral argument on August 24, 1994 is 31 pages. Kizelnik's alleged option to purchase the Stein House first came up at the August 24 hearing. After a dozen pages or so of contentious arguing about prior proceedings, Kizelnik took the stand and testified on direct examination that she had made post-petition payments and that she had an option to buy the Stein House. On cross-examination Kizelnik testified that she had a written document constituting an option called a shtariska, written in Hebrew or Yiddish which she asserted is binding under Jewish law. After counsel for USB objected that "the evidence

of this option to purchase has not even been presented before the Court in this case" (Tr. 22), counsel for both sides conferred at the bench off the record (Tr. 23). Thereafter, the transcript contains inconclusive dialog concerning a possible conditional order, after which the following exchange took place (Tr. 28–29):

MR. ACKERMAN: Your Honor, I would submit that interest is not sufficient to make this property of the estate. Anyone could come in and say I have a right to buy. It is just not sufficient to make it property of the estate and get the benefit of the stay.

MR. KLEIN: It absolutely is; you are wrong on the law.

MR. ACKERMAN: You don't have case law.

THE COURT: Mr. Klein, you are not willing to enter into a stipulation with the bank. The Court will consider this matter submitted for my determination. Is there anything further, gentlemen?

MR. KLEIN: We can provide the shtariska; the translation of the shtariska that will help Your Honor. We will provide that to you.

THE COURT: And some law—a brief on the law which indicates that that is sufficient to constitute the transfer of an ownership of the property?

MR. KLEIN: When would you like that, Your Honor?

THE COURT: I will ask you to do that. The translation to be under oath and submit it to the Court and then I want some law that indicates that that document is sufficient to convey an interest in real property under the state laws of the State of New York.

MR. ACKERMAN: Can I also submit something and also—

THE COURT: I will ask counsel to submit simultaneous briefs to the Court on or before September 9th.

MR. ACKERMAN: The name of that document was—how do you spell that?

MR. KLEIN: You know what it is. Well, it is a transliteration. It is my transliteration. S-h-t-a-r-i-s-k-a is how I transliterated it. The characters are Hebrew characters.

THE COURT: Gentlemen, this hearing is concluded.

(The Court proceeds to call the next hearing.)

Counsel later returned to the courtroom, and the following was placed on the record (Tr. 30–31):

MR. KLEIN: After conferring with my client, Your Honor, they don't want to spend any more money on this matter to have the translator translate the shtariska; to pay me to make a memorandum of law. They just want to continue as they represented they would in their petition and their plan. They are going to continue their payments and they just want to settle this and get on with their lives and keep their home.

MR. ACKERMAN: Your Honor, I shall submit to the Court a conditional order and settle it on notice to attorney Klein. Do you want me to go through the terms or—

THE COURT: Yes.

MR. ACKERMAN: Essentially the conditional order will require—the debtor actually testified earlier that she was willing to pay post-petition payments and also pay back arrearage over a Chapter 13 plan of three to five years.

So the conditional order will order that all post-petition payments be timely made by the first of the month.

MR. KLEIN: She asked till the 17th, Your Honor.

MR. ACKERMAN: Okay; let's—I mean I'm not going to argue about that. Post-petition payments have to be made; that fine. They have to be made by the 17th of the month.

And also all payments into the Chapter 13 Trustee—all the necessary deposits into the Chapter 13 Trustee to pay back the arrearage through the Chapter 13 plan should be timely made. If payments are not timely made, then I will submit via facsimile a right to cure; a notice to cure to attorney Klein's office. And if the payments are not cured within a five day

period—five business days—by the end of the fifth business day—then Ulster Savings Bank will submit an ex parte order granting relief from stay in this and all future cases filed by the debtor as it relates to this real property.

THE COURT: Very well. Counsel, you will settle the order then.

MR. ACKERMAN: And I shall send the order to Your Honor and do it on notice.

On this record, I conclude that the affirmative defenses cannot be sustained. It simply cannot be said that the parties litigated or "settled" the standing issue in August/September 1994. USB's motion to lift the stay in August 1994 was based on section 362(d)(1) for lack of "adequate protection" based on the failure to make any mortgage payments since May 1992. The motion did mention that Kizelnik, as a tenant, had "no equity interest therein which gives to her a superior lien position over the first mortgage of USB" (USB supporting affirmation ¶ 18), but lien priority is a far cry from the standing issue as presently framed. The first seed of a standing argument was planted with the mention of Kizelnik's purported "shtariska" option at the August 24 hearing, and it is perfectly plain from the transcript that no one in the courtroom (other than Kizelnik herself) had seen or knew what to make of this document, which has not been produced to this day.

The transcript reveals that the parties and the Court did not understand and were not prepared to confront the standing issue on August 24, not knowing the law or the facts. Thus, the Court called for briefs on the law (Tr. 29), and all concerned felt that production and translation of the shtariska would be necessary. The motion then pending before the Court was undoubtedly resolved by the conditional order, but that motion was not at all the same as the motion presently before this Court. It cannot be said that the September 7 Order constituted a knowing relinquishment by USB of its right to litigate the issues raised on this motion in the adversary proceeding, when the parties had neither the factual nor the legal understanding in August 1994 to effectuate a knowing waiver.

■ Kizelnik argues that USB's acceptance of mortgage payments from Kizelnik constitutes an "implied recognition" of standing on her part. But she cites no authority for the concept of waiver or estoppel by implication, and the case law provides no support for such doctrine in these circumstances. *See Matter of Nelson,* 66 B.R. 231, 236 (Bankr.D.N.J.1986) (quoting 5 S. Williston, *Law of Contracts* § 678 at 238–240 (3d ed. 1061)) (" '[A waiver] may result from implication or usage, or from any understanding between the parties which is of a character to satisfy the mind that a waiver is intended. The assent must, however, be clearly established and will not be inferred from doubtful or equivocal acts or language' "); *Mayer v. Development Corp. of America,* 541 F.Supp. 828, 856 (D.N.J.1981), *aff'd,* 688 F.2d 822 (3rd Cir.1982). Certainly there is nothing in the September 7 Order which would alert the reader that USB had waived an important substantive position which was not litigated in the August 1994 motion papers and which the August 24 hearing transcript shows neither the Court nor the parties understood when Kizelnik first mentioned the mysterious shtariska. The September 7 Order did not constitute a decision by the Court on any issue. The conditional order, entered on consent, resolved the August 1994 motion, and nothing more.

### *Affirmative Defenses; Counterclaims*

The foregoing discussion resolves substantially all of Kizelnik's affirmative defenses. The discussion of the standing issue resolves the First Affirmative Defense (failure to state a cause of action). The discussion of the September 7 Order resolves the Second Affirmative Defense (law of the case), Fourth Separate Defense (estoppel and waiver) and Seventh Separate Defense (collateral estoppel). Kizelnik has offered no documentary evidence in support of the Third Separate Defense. The Fifth Separate Defense (excessive penalties and charges), Ninth Separate Defense (lack of mutuality), Tenth Separate Defense (offset) and Twelfth Separate Defense (statute of frauds) all relate to USB's alternate claim for relief with respect to the amount of arrears required to be paid

in Kizelnik's Chapter 13 plan, which is rendered moot by the Court's conclusion that Kizelnik lacks standing. Finally, Kizelnik has offered no factual predicate for the Sixth Separate Defense (unclean hands) and the Eighth Separate Defense (unfair dealing).

Kizelnik's First Counterclaim asserts that USB's "acceptance of the Chapter 13 post-petition payments and payments pursuant to the plan to cure a lien on an asset of her estate is implied recognition that the debtor has an equitable interest in the property and estops the plaintiff from arguing that the debtor has no interest in the property" (¶ 27). She alleges in paragraph 29, without explication, that she has suffered damages of $1 million. The Court's decision on the issue of standing resolves all issues which might be raised within the scope of the First Counterclaim and mandates its dismissal on the merits. The Second and Third Counterclaims both relate to the measure of Kizelnik's obligation to cure the Steins' arrearages under her Chapter 13 plan, which is rendered moot by the Court's decision on the issue of standing.

The Fourth Counterclaim alleges that USB "commenced a planned program of harassment, consisting [sic] commencing unfounded litigation concerning an alleged claim . . ." (¶ 41) and that "[i]ncluded in these harassing techniques were telephone calls to Defendant's landlord, children, neighbors and her place of employment" (¶ 42). Kizelnik claims damages for this conduct in the amount of $100 million. The Fourth Cause of Action obviously raises issues of fact which cannot be resolved in a motion for summary judgment. It is a state law claim which can be resolved in the state court and need not be litigated in this Court.

### Relief to be Granted

▇▇ The Court's conclusion that Kizelnik does not have the right to de-accelerate and cure the Steins' long-defaulted mortgage or to invoke the automatic stay to preclude USB from exercising its right to foreclose warrants either relief from the stay under section 362(d)(1) for "cause," or dismissal of Kizelnik's Chapter 13 case. Since this case was filed solely for the purpose of blocking USB's fourth foreclosure sale scheduled for July 19, 1994, and since Kizelnik's own debts are de minimis and inconsequential, the Court will dismiss the petition. The dismissal order will provide that any further filing under the Bankruptcy Code by any person claiming an interest in the Stein House will not operate as an automatic stay on USB's right to foreclose in the absence of a further order by this Court on notice to USB. *See, In re Ouverson,* 79 B.R. 830 (Bankr. N.D.Iowa 1987); *In re Kinney,* 51 B.R. 840 (Bankr.C.D.Cal.1985); *In re Wong,* 30 B.R. 87 (Bankr.C.D.Cal.1983). The First, Second and Third Counterclaims are dismissed for the reasons stated above. The Fourth Counterclaim will be dismissed, without prejudice in the event Kizelnik is advised to assert such a claim in state court. The cross-motions for sanctions are both denied.

The controversy between USB and the Steins and their granddaughter Kizelnik has been the subject of numerous proceedings in the state courts, three separate bankruptcy cases in this Court and innumerable decisions and orders in all of the courts affirming and reaffirming USB's right to proceed with and consummate its foreclosure on its collateral. Countless hours have been spent in open court and in writing decisions by four separate judges of this Court and at least several justices of the State Supreme Court, not to mention the time and effort of law clerks, judicial secretaries and other support staff. The Steins and Kizelnik have had their day in court, over and over again. The time has come to bring this interminable skein of litigation to an end.

Within three days after docketing of this decision, counsel for USB will settle an order consistent with this decision on three days' notice.